# EXHIBIT 2



# Planet Depos®

We Make It *Happen*™

# **Transcript of Richard Ketaily**

**Date:** May 27, 2021

**Case:** 3534 East Cap Venture, LLC, et al. -v- Westchester Fire Insurance Co., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1          UNITED STATES DISTRICT COURT FOR THE

2                 DISTRICT OF COLUMBIA

3

4    3534 EAST CAP VENTURE,          )

5    AND                            )

6    MCCULLOUGH CONSTRUCTION, LLC  )

7          Plaintiff,              )

8    V.                            ) Case No.

9    WESTCHESTER FIRE INSURANCE    ) 1:19-cv-02946-APM

10   COMPANY                       )

11   AND                           )

12   ENDURANCE AMERICAN INSURANCE  )

13   COMPANY                       )

14      Defendants.                )

15

16           DEPOSITION OF RICHARD KETAILY

17              Conducted Virtually

18           Thursday, May 27, 2021

19                10:04 a.m. EST

20   Job No.: 376399

21   Pages: 1 - 87

22   Reported by: Lynne Livingston

1        Deposition of RICHARD KETAILY, conducted

2   remotely.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   Pursuant to notice, before Lynne Livingston, a

22   Notary Public for the State of Maryland.

```
 1              A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4        ERIK B. LAWSON, ESQUIRE

 5        SILVER & BROWN, P.C.

 6        10621 Jones Street

 7        Suite 101

 8        Fairfax, Virginia 22030

 9        703-591-6666

10

11

12

13   ON BEHALF OF THE DEFENDANTS:

14        DANIEL M. O'CONNELL, ESQUIRE

15        MOUND COTTON WOLLAN & GREENGRASS LLP

16        One New York Plaza

17        44th Floor

18        New York, New York 10004

19        212-804-4552

20

21

22
```

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    4

1                  C O N T E N T S

2

3    EXAMINATION OF MR. KETAILY              PAGE

4        By Mr. Lawson                        5

5        By Mr. O'Connell                    82

6

7                  E X H I B I T S

8                  (Not Attached)

9                                           PAGE

10   Exhibit 1 Notice of Deposition          5

11   Exhibit 2 Internal Draft                5

12   Exhibit 3 Endurance American Insurance Policy 5

13   Exhibit 4 Reservation of Rights Letter  5

14   Exhibit 5 Letter of July 16, 2019       5

15   Exhibit 6 Denial Letter of August 7, 2019   5

16

17

18

19

20

21

22

Transcript of Richard Ketaily
Conducted on May 27, 2021                                  5

1             P R O C E E D I N G S

2         (Exhibits 1 through 6 were marked for

3    identification and are not attached to the

4    transcript.)

5    Whereupon,

6                   RICHARD KETAILY,

7    The witness called for examination, having been

8    first duly sworn, was examined and testified as

9    follows:

10                      EXAMINATION

11   BY MR. LAWSON:

12        Q.    Good morning, Mr. Ketaily.  My name is

13   Erik Lawson and I represent East Cap Venture and

14   also McCullough Construction in this matter.

15             I'm going to share my screen with you

16   initially and show you a copy of the amended notice

17   of deposition.  Can you see that?

18        A.    Yes, I can.

19        Q.    Have you seen this document before?

20        A.    Yes, I have.

21        Q.    And is it your understanding that you're

22   here to testify as the designee for SOMPO

1    International?

2        A.    Yes, it is.

3        Q.    Have you ever had your deposition taken

4    before?

5        A.    Yes, I have.

6        Q.    How many times?

7        A.    I would say approximately 15.

8        Q.    And how recently have you had it taken?

9        A.    Within the last 60 days I think was the

10   last one.

11       Q.    Okay.  Then I'm not going to go through

12   the rules of the road since it sounds like you know

13   how these things work.

14             Before your deposition did you review the

15   areas of inquiry that we sent attached to this

16   notice of deposition?

17       A.    Yes, I did.

18       Q.    And what did you do to prepare to answer

19   questions in these areas of inquiry?

20       A.    I reviewed documents such as these

21   associated with the file and I did have discussion,

22   two discussions or discussions with counsel.

Transcript of Richard Ketaily
Conducted on May 27, 2021                                        7

1      Q.    Without telling me what those discussions

2   were can you identify the documents that you looked

3   at?

4      A.    I looked at the responses, I looked at the

5   claim file, which includes the adjustor's log

6   notes, the reports from the independent adjustor,

7   it does include some correspondence between the

8   adjustor at SOMPO and the independent adjustor.  I

9   looked at I believe the reports furnished by the

10  experts as well, and I also looked at the policy

11  that was applicable to this insured and the claim.

12     Q.    Any other documents that you looked at?

13     A.    Not that I can recall offhand.

14     Q.    What is your educational background

15  starting with any college that you've had?

16     A.    You broke up a little bit, but I heard

17  college, so I do have a Bachelor's of Science

18  degree in business administration from Webber

19  International University, and that was in 1990.

20  That is my highest level of education.

21     Q.    What your experience in the insurance

22  business?

1        A.      Would you prefer I just go through

2    chronological what that's been?

3        Q.      That would be fine, yeah.

4        A.      Okay.  1992 to 2000, I worked for State

5    Farm Fire and Casualty in California as an adjustor

6    and then a re-inspector on property losses.  From

7    2000 to 2004, I was a claims specialist for

8    Atlantic Mutual, I believe it's Insurance Company

9    is how it's actually phrased in Atlanta, Georgia.

10              Then from 2004 to 2006, I worked for

11   Westchester Fire and Casualty Company in

12   Alpharetta, Georgia as a claims specialist.  From

13   2006 to 2011, I believe, or '12, I was a property

14   team manager for the field for Fireman's Fund

15   Insurance Company in Alpharetta, Georgia.

16              From 2013 to 2015, I'm sorry, 2012 to

17   2013, sorry, I worked for Crawford and Company as a

18   TPA, third party administrator, in Atlanta,

19   Georgia.  From 2013 to 2015, I worked for Maxum

20   Specialty Insurance Company as a property claims

21   manager.  And then I joined Endurance in 2015, now

22   known as SOMPO, now part of the SOMPO Group, as an

1   assistant vice president for property and inland

2   marine claims.

3        Q.    Okay.  Were you ever fired from any of

4   these jobs?

5        A.    No, I was not.

6        Q.    Okay.  You said that beginning in 2013 to

7   2015, you initially said that you worked as a third

8   party adjustor, but then you also said that during

9   the same time period you were a property claims

10  manager?

11       A.    So to clarify --

12       Q.    Can you --

13       A.    I'm sorry, go ahead.  I apologize.

14       Q.    Yeah, can you clarify that?

15       A.    Yeah, I believe it was around 2012.  One

16  second.

17            I believe it was around 2011 or '12, I

18  went over to Crawford and Company as a third party

19  administrator.  From 2012 or so to 2015, that's

20  when I was at Maxum Specialty Insurance Company as

21  a property claims manager.  But then in 2015 is

22  when I joined Endurance.

1      Q.      So you only worked for Crawford and

2   Company for a year?

3      A.      That's correct.

4      Q.      And since 2000, you've been based in

5   Georgia?

6      A.      That is correct.

7      Q.      And are you still based in Georgia?

8      A.      Yes, I am.

9      Q.      When was your first interaction with this

10   loss?

11      A.      I believe it was -- well, my first

12   interaction with the loss itself was when the loss

13   was submitted because at that time I was assigning

14   claims for this group, and I assigned the claim to

15   Kerry Crawford.

16      Q.      And then when was the next time that you

17   interacted with this claim in particular?

18      A.      I'd have to go back and confirm with the

19   log notes, but I believe shortly thereafter Kerry

20   had a question regarding the stance or wanted to

21   discuss the stance of the final, and then at one

22   point soon after I believe he was out of the office

1    on vacation so I asked Linda Parham to assist on

2    this file in his absence.

3        Q.    Okay.  What is your role at Endurance

4    SOMPO as assistant vice president for inland marine

5    claims?

6        A.    So if I can clarify, when I joined the

7    company that was my role as assistant vice

8    president for property and inland marine, at that

9    time it was my job at one point to handle the

10   claims as a team of one.  And then as the team grew

11   it was my responsibility to manage that team, which

12   included assigning claims, assisting in file

13   reviews, reviewing files for coverage questions or

14   authorities and determining what, you know, any

15   kind of elevation to management above myself.  And

16   my role has changed since then.

17       Q.    Was that your role at the time that this

18   loss came to SOMPO?

19       A.    Yes, it was.

20       Q.    And what has your role changed into since

21   that time?

22       A.    At this time because the company has

1    grown, we now specialize in different lines and I

2    specialize in property, and I have moved from

3    management to a senior technical role where I

4    handle my own large loss files as part of a team.

5        Q.    Okay.  So when did that happen?

6        A.    I moved from my other role in January of

7    this year.

8        Q.    Okay.  So between 2015 and December of

9    2020, you were assistant vice president in charge

10   of inland marine claims?

11       A.    It was actually I started out as assistant

12   vice president for property claims and inland

13   marine, and then once it changed to vice president

14   there was a promotion in that as well.  And as of

15   December 2020, my title was vice president for

16   property and inland marine claims.

17       Q.    Had you had experience with inland marine

18   claims prior to 2015?

19       A.    Yes, I did.

20       Q.    And in what capacity did you have

21   experience with inland marine claims, as opposed to

22   property claims?

Transcript of Richard Ketaily
Conducted on May 27, 2021                               13

1      A.      During my time at Atlantic Mutual I

2   handled both property commercial claims, as well as

3   inland marine claims, which could builder's risk,

4   equipment, installation policies or endorsements.

5      Q.      Okay.  And then did you handle inland

6   marine claims at Westchester, Fireman's Fund or

7   Crawford?

8      A.      Westchester, no.  Fireman's fund, no, but

9   at Maxum, which was my employment prior to

10  Endurance I handled both commercial property and

11  inland marine.

12     Q.      What's the difference in your mind between

13  property policy and inland marine policy?

14          MR. O'CONNELL:  Objection.  You can

15  answer.

16     A.      Okay.  The difference, I'm sorry, you said

17  in the policies?

18     Q.      Yeah, between property and inland marine.

19     A.      Well, the difference in the policies is

20  that there's different coverages under each.  Some

21  may be the same but there are different coverages

22  as well, considering the type of risks that you're

1    insuring with those forms.

2        Q.    Can you be specific about how the types of

3    risks are different between property and inland

4    marine?

5        A.    Sure.   I guess the biggest probably

6    example when it comes to coverages or coverage

7    forms of builders or inland marine, or builder's

8    risk form is typically for a building that is

9    either under construction, a new building, or it's

10   an existing building where renovations are being

11   completed, where on the flip side a commercial

12   property form under property that's covered will

13   specifically exclude property that's under

14   construction, etcetera.

15        So from that viewpoint, you know, the

16   policies I think are intended to cover different

17   types of risks in that regard.   One is an existing

18   building, more or less, and one is a building under

19   construction.   That's to me the biggest difference

20   between those forms.

21        Q.    Okay.   And on this case what was your role

22   with respect to this loss, starting with assigning

1    it and then going forward as it was adjusted?

2        A.    My role as the manager for the team after

3    I adjusted the file to Kerry would be to assist if

4    needed with any type of coverage question that was

5    presented to me by Kerry as the adjustor.  And then

6    typically files are under file review every 90 or

7    120 days.  And then of course if anything got

8    escalated to me as a manager from anybody else, I

9    would step in to take a look versus the adjustor.

10       Q.    That's the general process.  Did you do

11   all of those things with respect to this claim that

12   we're here to talk about today?

13       A.    I can go back and look, if you can pull up

14   the claim notes, I believe in this file after the

15   initial assignment, I don't recall specifically if

16   the coverage question was brought to my attention.

17             I do recall that there was a reservation

18   of rights at one point that was proposed.  I

19   believe at that point that was given to me to

20   review and at that time I gave my comments back to

21   Kerry or Linda regarding that draft.

22       Q.    Did you participate in the denial of this

1    claim?

2            MR. O'CONNELL:  Object to the form.  You

3    can answer.

4        A.    Typically I would, yes, if a claim was

5    being, looked like there was not coverage for a

6    claim being denied, those letters are supposed to

7    come through the manager for approval and be

8    escalated if necessary, or approved.

9        Q.    So maybe I didn't understand the answer.

10   Did you or did you not participate in the denial of

11   this claim?

12       A.    I believe, yes --

13           MR. O'CONNELL:  Objection to form.

14       A.    Sorry.

15           MR. O'CONNELL:  You can answer.

16       A.    I believe I reviewed the denial in regard

17   to this claim, yes.

18       Q.    Okay.  And you also participated in the

19   drafting a reservation of rights letter?

20       A.    Yes, I did.

21       Q.    There's a SOMPO specific denial that's

22   been produced as part of this case and then there

1   are Sedgwick communicated denials that appear to be

2   on behalf of both SOMPO and Westchester.  Do you

3   know if the SOMPO denial was sent out or whether

4   that was an internal draft?

5       A.    I believe that was an internal draft and

6   that is, from my recollection is where I offered my

7   input about how the actual letter should be drafted

8   and communicated.

9       Q.    I'm going to show you a version that I

10  have, and just so we're on the same page I'm going

11  to mark this one as Exhibit 2 with the amended

12  notice of deposition as Exhibit 1.

13          Is this Exhibit 2 the draft, the internal

14  draft that SOMPO put together concerning coverage?

15      A.    That does look like that, yes, it does.

16          (Reporter asks for clarification.)

17      Q.    And that is correct that if you need to

18  have me scroll through the document slowly so you

19  can read the whole thing to answer a specific

20  question, then just let me know and we can do that.

21      A.    Okay.

22      Q.    What is SOMPO's understanding of the cause

1    of loss in this case?

2         A.    From what I recall, our understanding was

3    the fact that there was a lack of a vapor barrier

4    which resulted to condensation to the interior of

5    the project.

6         Q.    Okay.  And that's a manmade cause, it's a

7    failure to include the vapor barrier in the roof

8    that is the cause of the loss?

9         A.    I would categorize it as that partially,

10   yes, the lack of a vapor barrier creates the

11   situation which then allows the condensation on the

12   interior to occur.

13        Q.    Under the policy are you familiar with the

14   cost of making good exclusion?

15        A.    Yes, I am.

16        Q.    And in that exclusion is it your

17   understanding that the building would not be

18   considered damaged by the lack of a vapor barrier

19   itself, correct?

20             MR. O'CONNELL:  Objection to form.  Are

21   you going to show him the policy or are you just

22   going to ask him from memory?

1      Q.    Would it help you to look at the policy to

2  answer that question?

3      A.    It would, if you wouldn't mind please.

4      Q.    Sure.   I'm marking as Exhibit 3 the

5  Endurance American Insurance Company policy IMU

6  100120131.   And I'm going to go down to the section

7  on exclusions.   Do you see the exclusion 17, cost

8  of making good?

9      A.    Yes, I do.

10      Q.    And do you see that the last paragraph of

11  cost of making good says that for the purpose of

12  this policy and not merely this excluded cost of

13  loss, insured's property shall not be regarded as

14  damaged solely by virtue of the existence of any

15  conditions stated under A or B above.   Do you see

16  that?

17      A.    Yes, I do.

18      Q.    And so my question is, is it your

19  understanding that under the policy the lack of a

20  vapor barrier itself would not constitute damage to

21  the project simply because there was no vapor

22  barrier?

1           MR. O'CONNELL:  Objection.  You can

2   answer.

3       A.    Not necessarily.  The ensuing loss would

4   still need to be a loss that's not otherwise

5   limited or excluded in the policy as well.

6       Q.    Right, and this is an all-risk policy,

7   correct?

8       A.    I believe so, yes.  That's correct.

9       Q.    And what does an all-risk policy cover?

10          MR. O'CONNELL:  Objection.  You can

11   answer.

12      A.    An all-risk policy, my wording covers just

13   what it says.  It's an all-risk policy.  It covers

14   all perils unless otherwise excluded or limited

15   under the policy.

16      Q.    Right.  So any peril suffices unless it's

17   excluded or limited under an all-risk policy,

18   correct?

19      A.    I'm sorry, you broke up for a second.  Can

20   you just repeat that real quick?

21      Q.    Sure.  So an all-risk policy covers any

22   direct physical loss caused by any peril unless

Transcript of Richard Ketaily
Conducted on May 27, 2021                    21

1   that peril is excluded or limited?

2       A.   Correct.  I'm sorry, give me one second

3   because I thought I turned off my phone.  Let me

4   turn it off fully.  I thought it was already off,

5   so I apologize.  All right, go ahead.

6       Q.   Okay.  So is it SOMPO's position that

7   the -- let me start over.

8            SOMPO's position is that the lack of a

9   vapor barrier caused the loss and that the damage

10  to the building was caused when water condensed

11  between the wood and the insulation on the

12  underside of the roof system, correct?

13           MR. O'CONNELL:  Objection.  You can

14  answer.

15      A.   Okay, sorry.  My recollection is the fact,

16  to your point or to the point, the lack of a vapor

17  barrier is what contributed to the loss and then

18  the level of I would say moisture or atmosphere in

19  the building is what contributed to the actual

20  damage that was later seen in the building.

21           So it's not so much just the lack of a

22  vapor barrier, it's the condition that it creates

1    or allows.

2        Q.    Do you think that the building was damaged

3    by the presence of moisture in the air or do you

4    think it was damaged when the building materials

5    got wet?

6              MR. O'CONNELL:  Objection to form.  You

7    can answer.

8        A.    I think that in my view the building was

9    damaged by the -- the items being wet is what

10   created the moisture in the air, in the building.

11   That's to me ask what caused damage, in my view.

12       Q.    What items were wet?

13       A.    From what I understand and my recollection

14   the lack of a moisture barrier allows for moisture

15   to get into the building, the moisture inside the

16   building then, in my understanding, creates

17   condensation that then adheres to the building

18   materials itself.

19       Q.    Does this policy exclude condensation?

20       A.    I believe so.

21             MR. O'CONNELL:  Objection to form.

22       Q.    I didn't hear your answer.

1      A.     I believe so.  Condensation, or I believe

2   dampness, dampness in the atmosphere, along those

3   lines.  I use the term condensation but

4   realistically I'm speaking of dampness.

5      Q.     And what atmosphere was damp?

6      A.     To my recollection --

7             MR. O'CONNELL:  Objection.  You can

8   answer.

9      A.     My recollection is that the atmosphere or

10  the area inside the building was damp due to the

11  lack of a moisture barrier, a vapor barrier --

12  sorry, moisture barrier.

13     Q.     Did SOMPO do anything to measure the

14  moisture in the building?

15     A.     I would have to refer to the engineers'

16  reports.  I believe there were engineers retained

17  on the file at the request of the carriers for

18  further investigation.  I'd have to look at their

19  files in that regard, see if that report is in the

20  file and review that.

21     Q.     Do you think it makes any difference in

22  coverage under the policy whether the people who

1  were talking about the loss referred to the loss as

2  being moisture damage or water damage?

3          MR. O'CONNELL:   Objection.   You can

4  answer.

5      A.    Do I think there's a difference, is that

6  correct, is that what you said?

7      Q.    I'm asking you if you think it makes any

8  difference to coverage?

9      A.    I do, yes.

10      Q.    What's the distinction between moisture

11  damage and water damage in your view?

12      A.    Moisture damage to me can mean just the

13  presence of heavy moisture in the air that causes

14  damage per se, versus water damage, which typically

15  would mean, could mean actual, you know, water from

16  a pipe break, the actual liquid touching the

17  surface and causing the damage versus just what's

18  in the air around it.

19      Q.    Okay.   So it's your position that if it's

20  water in the air, it's not covered but if it's

21  liquid water, it's covered?

22          MR. O'CONNELL:   Objection to form.

1       A.    Well, to further -- I guess to further

2   expand on that, yes, water or moisture that's just

3   in the air is typically in my mind is one, is going

4   to be one component.  Water that is in the

5   building, again from -- it depends on what the

6   actual cause of that water is.  If it's typically

7   under the policy if you have water from a pipe

8   break, water from flood, it might be covered.  It's

9   the actual physical water damaging something versus

10  just the presence of water in the atmosphere of the

11  building which then, you know, might result in

12  damage.

13      Q.    You agree with me, scrolling back up to

14  the declarations page here, you would agree with me

15  that this policy covers both flood and water damage

16  because it has a deductible for each one of those

17  two things, right?

18            MR. O'CONNELL:  Objection.  You can

19  answer.

20      A.    Yeah, I don't think we talked about those.

21  Are you saying would I agree or I did agree?

22      Q.    Do you agree that the policy covers both

Transcript of Richard Ketaily
Conducted on May 27, 2021                        26

1    flood and water damage?

2        A.    To your point, based on this section, our

3    deductibles, yes, I would assume it covers both

4    flood and water because it does state a specific

5    deductible.

6        Q.    All right.  And the capitalized term here,

7    water damage, means that it's a defined term under

8    the policy?

9        A.    Typically, yes, either bolded and it's

10   capitalized.

11       Q.    Let me see if I can find the provision

12   that says that.

13            On page 6 of 42 of the BR contract, 101016

14   form, construction risk form, it says words and

15   phrases that appear in capitals are defined in this

16   policy.  Do you see that?

17       A.    Yes, I do.

18       Q.    And that's consistent with what you're

19   saying that the capitalized words are specifically

20   defined under the policy?

21       A.    Yes.  Once again, some policies

22   capitalize, some policies bold.

Transcript of Richard Ketaily
Conducted on May 27, 2021                                27

1       Q.     Right.  And in this case this policy says

2    to refer to part F, the definitions section, to

3    read those definitions?

4       A.     Yes, that's what it says there, yes.

5       Q.     If we go to part F, definitions, which

6    begins on page 26 of 42, one of the definitions

7    here is of flood.  Do you see that?

8       A.     Yes, I do.

9       Q.     And the last line of flood says, the flood

10   does not include the accumulation of water from any

11   source on a roof or other surface of a building,

12   dwelling or structure.  Do you see that?

13      A.     Yes, I do.

14      Q.     And so if there was a flood loss to this

15   project, the policy would cover it with the limits

16   and deductibles that are shown on the declarations

17   page, correct?

18      A.     I would say, yes, as long as the actual

19   facts of the loss meet the definition of flood,

20   yes.

21      Q.     And then there's also a definition of

22   water damage, which is all water damage except loss

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    28

1    caused by or resulting from the peril of flood.  Do

2    you see that?

3         A.    Yes, I do see that.

4         Q.    And is it your understanding that water

5    damage in this definition means liquid water?

6              MR. O'CONNELL:  Objection to form.  You

7    can answer.

8         A.    My understanding would be, yes, that's

9    correct.

10        Q.    And between the flood coverage and the

11   water damage coverage it covers all liquid water

12   perils, correct?

13             MR. O'CONNELL:  Objection.  You can

14   answer.

15        A.    Well, not necessarily.  You have, I mean

16   what you're looking at is the definition of what

17   flood is defined as and as water, but also under

18   the policy there are other limitations and

19   exclusions that may apply to a peril or a loss.  So

20   we're kind of jumping from one to the other, if

21   that makes sense.

22        Q.    Let me bring you back to the exclusions.

Transcript of Richard Ketaily
Conducted on May 27, 2021                                29

1    On page 12 of 41 of this coverage form there's a

2    list of excluded causes of loss.  Do you see this

3    bolded language at the front of that?

4        A.    Yes.

5        Q.    Do you know what that's called in the

6    insurance industry?

7              MR. O'CONNELL:  Objection.

8        A.    I refer to that as the exclusions, I mean

9    that's how I always refer to that.  So I'm pretty

10   familiar with -- sorry, go ahead.

11       Q.    Are you familiar with the phrase

12   anti-concurrent causation language?

13       A.    Yes, I am.

14       Q.    And is it your understanding that this

15   particular language in this particular bolded

16   clause at the front of the excluded causes of loss

17   section of the policy, is this anti-concurrent

18   causation language?

19       A.    Yes, it is.

20       Q.    And you know that because it says that the

21   exclusion applies whether the loss is caused

22   directly or indirectly by any of the following?

Transcript of Richard Ketaily
Conducted on May 27, 2021                                      30

1         A.    Yes, regardless, yes.

2         Q.    Right, regardless of any other cause or

3   event that contributes concurrently or in any

4   sequence to the loss, although for some reason the

5   policy is missing the word, any, between in and

6   sequence?

7         A.    Correct.

8         Q.    And that's anti-concurrent causation

9   language and that applies to these exclusions 1

10  through 17.  Do you see this other bolded language

11  down here?

12        A.    Yes, I do.

13        Q.    Which applies to the dryness or dampness

14  of atmosphere exclusion?

15        A.    Yes, I do.

16        Q.    Is this paragraph anti-concurrent

17  causation language?

18        A.    I don't believe so, no.

19        Q.    And as an insurance adjustor are you aware

20  of the standard that applies in the absence of

21  anti-concurrent causation language?

22              MR. O'CONNELL:  Objection.

Transcript of Richard Ketaily
Conducted on May 27, 2021                                   31

```
1       A.      Should I answer?

2               MR. O'CONNELL:  You can answer.  I'm

3    sorry.

4       A.      And I'm sorry, repeat your question real

5    quick, please.

6       Q.      As an insurance adjustor are you familiar

7    with the name or the role that applies in the

8    absence of anti-concurrent causation language?

9               MR. O'CONNELL:  Objection.  You can

10   answer.

11      A.      Thank you.  Actually I'm not familiar with

12   the name offhand.  I just know that when I review a

13   policy to look and see if there is anti-concurrent

14   causation language or not.

15      Q.      And are you familiar with the phrase

16   efficient proximate cause?

17      A.      Yes, I am.

18      Q.      Is that the phrase that SOMPO uses to

19   refer to the cause of loss in the absence of an

20   anti-concurrent causation exclusion?

21      A.      I've heard it referred to as efficient

22   proximate cause, proximate cause.  Typically it's
```

1    one of those two terms.

2        Q.    Right.  I want to talk more about the cost

3    of making good exclusion, and I want to give you a

4    hypothetical.  If a contractor installed all the

5    plumbing in a building and didn't glue some of the

6    connections, then the SOMPO policy would exclude

7    the cost to go back through the building and reglue

8    the joints, correct?

9            MR. O'CONNELL:  Objection.  You can answer

10   if you understand.

11       A.    Well, you refer to it as SOMPO policy but

12   I think they're standard builder risk forms, and my

13   understanding is while the policy would not, the

14   policy would not go back to reglue what was not

15   done properly in the beginning, but if the ensuing

16   damage wasn't otherwise excluded, it would still

17   cover that damage, meaning water coming out of the

18   pipe and damaging drywall as an example.

19       Q.    Right.  And that's where I'm going with

20   it.  But initially if you just find out that all of

21   the water supply lines have in parts not been

22   glued, so if you activate the water, they're going

1    to blow apart and you're going to have a bunch of

2    water damage, the policy doesn't cover the costs to

3    fix that defect?

4        A.    Correct.

5              MR. O'CONNELL:  Same objection.  You can

6    answer.

7        Q.    But if someone, again, like we were

8    talking about, if someone opened up the water

9    supply line valves so that the unglued joints came

10   apart and water soaked the walls in water, then the

11   cost to fix the water damage would be covered?

12             MR. O'CONNELL:  Objection.  You can

13   answer.

14       A.    Yes, the ensuing damage, yes.

15       Q.    And that would be the same if it was some

16   sort of system in the building that contains steam,

17   correct?

18             MR. O'CONNELL:  Objection.  You can

19   answer.

20       A.    It would depend on what the actual damage

21   from the steam was, what damage was found in the

22   building after that and how it's classified, and

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    34

1    then to see if any other limitations or exclusions

2    would apply.

3        Q.    Okay.  But if the cause of the damage was

4    this defect, then the ensuing damage from another

5    covered peril would be covered, correct?

6              MR. O'CONNELL:  Objection.  You can

7    answer.

8        A.    Can you please either repeat or rephrase

9    the question again, please?

10       Q.    Sure.  The hypothetical we went through

11   with the plumbing and the glue joints --

12       A.    Right.

13       Q.    Was meant to explain that just because

14   it's something that you would expect to happen from

15   failing to glue the joints of a water supply system

16   in the building doesn't mean that it's excluded

17   under the cost of making good exclusion, correct?

18             MR. O'CONNELL:  Objection.  You can

19   answer.

20       A.    I guess to clarify, what I would expect is

21   if they have to go back and reglue the joints is

22   not covered, but the ensuing loss if it's not

Transcript of Richard Ketaily
Conducted on May 27, 2021                    35

1    otherwise excluded would be covered in that

2    scenario.

3        Q.    Okay.  You would agree with me that the

4    policy doesn't talk about condensation, or humidity

5    or moisture at all?

6              MR. O'CONNELL:  Objection.  You can

7    answer.

8        A.    I would have to review the policy again

9    but I don't believe so.  I believe along the lines

10   of dampness or dryness, I don't know if it mentions

11   moisture or not.

12       Q.    You're still looking at the policy,

13   correct?

14       A.    Correct, on your screen.

15       Q.    Okay.  I'm typing in condensation, right?

16       A.    Yeah.

17       Q.    And if I click next, you can see that no

18   matches are found?

19       A.    Yes.

20       Q.    Okay.  So would you agree with me that the

21   policy doesn't refer to condensation at all?

22             MR. O'CONNELL:  Objection.  You can

Transcript of Richard Ketaily
Conducted on May 27, 2021

36

1   answer.  The policy speaks for itself, and when you

2   say -- can you clarify your question?  Does it

3   contain those specific words, is that the question?

4       Q.    Yeah, you agree that the policy doesn't

5   contain the word condensation at all?

6               MR. O'CONNELL:  Same objection.  You can

7   answer.

8       A.    Based on this search, that's correct.

9       Q.    And if I use the same methodology for the

10  word moisture, the word moisture doesn't appear in

11  the policy at all?

12              MR. O'CONNELL:  Same objection.  You can

13  answer.

14      A.    Based on this search, that's correct.

15      Q.    And I think the last one was humidity.

16  The word humid doesn't appear in the policy at all

17  either?

18              MR. O'CONNELL:  Same objection.  You can

19  answer.

20      A.    That's correct, again, based on this

21  search it does not.

22      Q.    And the search for the word humid would

1    return anything that has the word humid in it,

2    correct?

3        A.    That's my understanding.

4            MR. O'CONNELL:   Objection.

5        A.    If I could ask one question, please?   In

6    your discussion about the policy from my

7    recollection are there any other endorsements that

8    are attached that would be separate documents

9    applicable to this loss that speak to coverages, or

10   are we talking about just this form itself?

11       Q.    So let met clarify that.   So the exhibit,

12   which is Exhibit 3, which is the Endurance policy,

13   is composed of forms that are identified on the

14   declaration page, correct?

15       A.    Yes, at the time of issuance, that's

16   correct.

17       Q.    Right.   And for example, there's this OFAC

18   form, and if you search through the policy you'll

19   see that there's a page 1 of 1 U.S. Treasury

20   Department Office of Foreign Assets Control

21   policyholder notice that's part of the policy,

22   correct?

1      A.    Mm-mm, correct.

2      Q.    But that's a separate form from the form

3  that we were looking at, which was the main policy

4  form called --

5      A.    And if I can just clarify my question, if

6  that's okay?  Do you mind?

7      Q.    Sure.

8      A.    So I understand that the policy you're

9  looking at contains the dec page and the coverage

10  forms and any endorsements.  These were all issued

11  or included at the time of issuance of the policy

12  which is why we see that one page with the

13  different forms and form numbers listed.

14          I guess to clarify, if there were any kind

15  of endorsements issued that were issued after the

16  policy issuance, while they're part of an

17  underwriting file, they would not be necessarily

18  listed on this policy here if they were issued

19  after the policy was.

20          I was just I guess wanting to confirm that

21  there's no other endorsements issued subsequently

22  that speak to the policy language in question,

1    that's all.  Does that make sense?

2        Q.    I think the answer to that issue is there

3    may or may not be extensions of the main policy but

4    there's not anything that affects the exclusions or

5    limitations that I'm aware of, but you know, as

6    builder's risk policies are usually written they

7    have extensions through the end of the project, is

8    that your understanding as well?

9        A.    It is.  And you've answered my question

10   then, that's fine.

11       Q.    The policy covers weather conditions,

12   correct?

13            MR. O'CONNELL:  Objection.  You can

14   answer.

15       A.    The policy to me covers certain types of

16   loss from certain weather conditions.  It depends

17   on the weather condition.

18       Q.    Okay.  So if a severe thunderstorm came

19   through and there was a strike on the roof that

20   caused penetration and the rain fell and got into

21   that crack, the policy would cover the strike to

22   the roof and the interior water damage from the

Transcript of Richard Ketaily
Conducted on May 27, 2021                    40

1    rain entering the strike from the roof, correct?

2            MR. O'CONNELL:  Objection.  You can

3    answer.

4        A.    Typically my understanding is, yes, that

5    is a scenario that would likely be covered under a

6    policy.

7        Q.    And that's true despite the fact that

8    storms are universally caused by dryness or

9    dampness in the atmosphere and extreme changes in

10   temperature?

11           MR. O'CONNELL:  Objection.  You can answer

12   if you understand.

13       A.    I believe I do and my answer would be from

14   a non-weatherman point of view or a layman's term,

15   yes, that that appears to be what causes weather.

16       Q.    Okay.  Who at SOMPO participated in the

17   decision to deny this loss?

18       A.    Typically for a denial like this, in this

19   case it would be the adjustor reviewing the file

20   who it's assigned to.  They normally elevate it, in

21   this case to me, as in this file for review, and

22   then the decision ends with the manager.  And we do

1   provide an acknowledgment typically to the broker

2   and underwriter that this letter's going out, or if

3   it's a reservation of rights, some kind of coverage

4   issue.  We just we give them advance acknowledgment

5   so they're aware.

6       Q.    Who was the manager for SOMPO in this

7   case?

8       A.    This would be me at the time.

9       Q.    Okay.  So Kerry Crawford participated in

10  the denial decision, you as the manager

11  participated in the denial decision.  Was there any

12  other person who reviewed this denial decision?

13      A.    I don't believe there's anyone else that

14  reviewed it.  We did send, I know we sent the

15  underwriter an acknowledgement so they were aware

16  of it, and typically we would advise the broker,

17  but that's, again, those are advices, not

18  approvals.

19      Q.    I see.  Did the underwriter contribute to

20  the denial decision or was he just advised of it?

21      A.    With a loss like this he was just advised

22  on this one.  There was no need, we wouldn't ask --

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    42

```
 1   we wouldn't have to have his approval or his input,

 2   it's merely for notice only.

 3       Q.    Right, and I just want to make sure we're

 4   on the same page.  You're saying that it wouldn't

 5   be needed, but did it happen in this case that he

 6   offered any input?

 7       A.    Not that I'm aware of.  What I recall it

 8   was just a heads up for him and that was it.

 9       Q.    Okay.  And who was the underwriter?

10       A.    Jason Holloman, I believe.

11       Q.    What was Jason Holloman's role with

12   respect to this risk?

13            MR. O'CONNELL:  Objection.  You can answer

14   if you know.

15       A.    Jason Holloman would be considered the

16   underwriter for this account regarding Endurance's

17   share on the policy -- sorry, for this policy for

18   our share of the account is a better way to phrase

19   it.

20       Q.    And what do underwriters do at SOMPO?

21            MR. O'CONNELL:  Objection, vague.  You can

22   answer.
```

1      A.      Underwriters, my understanding is

2    underwriters work with, I would say the broker or

3    someone on the agency side to consider a risk and

4    determine, you know, coverages, premium, exposure

5    appetite, I guess you could say.

6      Q.      The underwriter makes a decision whether

7    or not SOMPO wants to participate in covering, say,

8    a project?

9            MR. O'CONNELL:   Objection.   You can

10   answer.

11     A.      I would rephrase that slightly and say

12   that they give their input into more or less

13   deciding to cover a risk.   It depends also on I

14   would assume what guidelines they have for a risk

15   and what authority they have on their own end.

16     Q.      You're saying that Jason Holloman was the

17   underwriter on this project?

18     A.      Yes.

19     Q.      Would he have had the authority to add or

20   remove coverage forms when the policy was being

21   written?

22     A.      I wouldn't be aware of that, that's a

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    44

1  question really for an underwriter.  I'm not sure

2  how that works on their end authority-wise.

3       Q.    Okay.  So there's a separate hierarchy

4  that governs underwriting decisions at SOMPO that's

5  separate and apart from what you do?

6       A.    From claims, yes.

7       Q.    Okay.  Does Kerry Crawford still work for

8  SOMPO?

9       A.    No, he does not.

10       Q.    And when did he leave SOMPO?

11       A.    I would say around September, maybe late

12  September of 2020.

13       Q.    Do you know where he went?

14       A.    I don't know how to spell it, but he went

15  to Pulte, I think it's P-O-U-L-T-I maybe, Home

16  Builders.

17       Q.    Oh, do you mean P-U-L-T-E Homes?

18       A.    That could be it, yeah, Pulte Homes.  I

19  think I'm pronouncing it wrong, I just can't spell

20  it.

21       Q.    Yeah, that's a fairly large --

22       A.    Home builder, right.

Transcript of Richard Ketaily
Conducted on May 27, 2021                    45

1       Q.    Home builder, right.  Do you know what he

2   does for them now?

3       A.    He works in their, I guess you would say

4   their claims or risk management division.

5       Q.    Okay.  And --

6       A.    Erik, I'm sorry, what you said broke up.

7   Can you repeat that?

8       Q.    Do you have his contact information?

9             MR. O'CONNELL:  Are you asking for his

10  contact information?

11            MR. LAWSON:  Yes.

12            MR. O'CONNELL:  Okay.  I don't know if the

13  witness has it.  If you do, Rick, you can let him

14  know.  If not, you know, we're happy to provide

15  whatever kind of last known address or whatever we

16  have for him.

17            THE WITNESS:  I don't know it offhand.  I

18  had his cell number in my phone but that's actually

19  a work cell phone, his old work cell phone.

20  BY MR. LAWSON:

21      Q.    Okay.  So he returned the cell phone when

22  he terminated his employment?

Transcript of Richard Ketaily
Conducted on May 27, 2021                                          46

1       A.     Yeah, it was a company phone.  He is on

2   LinkedIn though.

3       Q.     Okay.  Are you familiar with the continued

4   leakage or seepage exclusions that's part of the

5   property policy?

6              MR. O'CONNELL:  Objection to form.  You

7   can answer if you understand.

8       A.     I believe under the commercial property

9   there's a section that provides or references a

10  number of days of continuous or repeated leakage,

11  if that's what you're referring to.

12      Q.     Yeah, so that is the exclusion I'm

13  referring to.  And are you familiar with that sort

14  of form language that's used in some policies to

15  exclude long-lasting humidity or condensation

16  events?

17             MR. O'CONNELL:  Objection to form.  You

18  can answer.

19      A.     Well, if you're speaking of the commercial

20  property form, to me they're two separate items.

21  One you have is continuous repeated leakage or

22  seepage of water, and then there's also certain

Transcript of Richard Ketaily
Conducted on May 27, 2021                    47

1    limitations that may apply to condensation,

2    etcetera.  So they're not always intertwined,

3    sometimes they're very separate.

4        Q.    Okay.  Are you familiar with ISO forms?

5        A.    ISO, yes.

6            MR. O'CONNELL:  Objection.  You can

7    answer.

8        A.    Sorry.  Yes, I am.

9        Q.    And what is an ISO form?

10       A.    My understanding of an ISO form is it's a

11   standard form that is not a derivative of a

12   specific company's own forms or endorsements that

13   they manuscript it themselves.  It's more of an

14   industry standard.

15       Q.    And does SOMPO subscribe to -- let me ask

16   it differently.

17           Does SOMPO have a relationship with ISO

18   where they receive industry bulletins and coverage

19   breakdowns and things like that from ISO?

20           MR. O'CONNELL:  Objection.  Erik you broke

21   up so I don't know if you can repeat it or it can

22   be read back.

Transcript of Richard Ketaily
Conducted on May 27, 2021                    48

1      Q.    Sure, I'll repeat it.

2            Does SOMPO have a relationship with ISO

3      where ISO provides, you know, specific exclusions

4      and coverages?  You're shaking your head.

5      A.    I'm sorry, it's almost like at the same

6      point that you get to it starts to breakup or

7      delay.

8      Q.    Okay.  Let me re-ask the question.  So the

9      question is, does SOMPO have some sort of business

10     relationship with ISO where ISO provides

11     information about its policies and its coverages to

12     SOMPO?

13     A.    I can only speak to claims, and I'm not

14     aware of anything specifically that isn't

15     accessible from their actual ISO website where we

16     would go in and we can look at like CAT

17     information, let's say.  I don't know if we receive

18     anything directly from them, at least on the claims

19     side.

20     Q.    Okay.  When you go in on ISO's website do

21     you log-in with a password or do you just go to

22     publicly available information?

1       A.     I log-in with a password and it's

2   specifically for notifications of PCS CAT codes for

3   weather events, which is pretty standard I guess

4   you would say.

5       Q.     So ISO provides a service where you can

6   look to see claims related to weather events?

7       A.     To clarify, you can look to see if ISO has

8   designated a weather event with a specific CAT code

9   or not.

10      Q.     What's a CAT code?

11      A.     It's, I would classify it as industry

12  terminology to designate a specific peril or perils

13  during a certain time frame for a certain

14  geographical area.  It's a way of I think states

15  tracking claims data.

16      Q.     Okay.  So for example, you had a bad storm

17  that was causing tornados throughout the midwest,

18  that might have a separate CAT code?

19      A.     That's correct.

20      Q.     And what do you do with a CAT code, how

21  does that help you do your work?

22      A.     It doesn't, I wouldn't say it helps us do

Transcript of Richard Ketaily
Conducted on May 27, 2021

50

1    our work.  It's just an identifier you put on the

2    claim for, I don't know if it's for reinsurance or

3    if it's for whatever classification, but it doesn't

4    change how you handle the loss at all.  It's just

5    like listing the loss location more or less.

6        Q.    And as an adjustor or doing the work of an

7    adjustor, is that all that you use the ISO log-in

8    to do?

9        A.    That's all I use the log-in to do.  And

10   also when a claim is submitted and set up there is

11   a notice that's sent to ISO automatically, not by

12   the adjuster, where they, where ISO keeps a record

13   of, I guess you could say insurance losses by claim

14   number and all those facts.  But that's not

15   something I enter myself.

16       Q.    Okay.  So ISO provides a service where

17   they track claims made in some sort of database and

18   you would have the ability, or somebody at SOMPO

19   would have the ability to go and say, for example,

20   how many losses has this insured ever had?

21       A.    Yeah, I guess a better way to clarify the

22   reasoning got that is they just log, they log the

Transcript of Richard Ketaily
Conducted on May 27, 2021                                51

1    occurrence of it.  And the only time in the past
2    I've seen the result of that is when there was a
3    duplicate claim set up for the same insured, but it
4    ended up being like a different property from the
5    same event.
6        Q.    I see.  Are there any policy
7    interpretation guidelines internal to SOMPO that
8    discusses the treatment of different exclusions or
9    other provisions of the policy?
10       A.    Not that I'm aware of, no.
11       Q.    Is there any third party source of that
12   sort of coverage analysis information that SOMPO
13   adjusters would use if they had a question about
14   coverage analysis under a policy?
15       A.    I guess the best way of saying that, in
16   terms of almost like a library or internal
17   resource, no.
18            I guess the flip side of that would be if
19   there is a claim with a question to what you're
20   speaking of that's when you may consider having
21   counsel involved to assist you with the review,
22   which is on a case by case basis.

1        Q.    Okay.  And so if you wanted to do coverage

2    analysis on a particular exclusion and its

3    applicability, then as part of your ordinary

4    adjusting practice you might ask to retain counsel

5    for a legal opinion as to that coverage analysis?

6            That's a terrible question.  Let me try it

7    again.  As part of SOMPO's ordinary adjusting

8    practices if its adjuster has a question or concern

9    about the exclusions under the policy that might be

10   applicable, SOMPO directs you to refer that

11   analysis out to coverage counsel?

12           MR. O'CONNELL:  Objection.  You can

13   answer.

14       A.    I would phrase my response is if there is,

15   at SOMPO as well as most companies where I've

16   worked, if not all, if there's a file with a

17   potential coverage question, whether it's regarding

18   the type of property, the cause of loss and

19   applicable exclusion, anything along those lines,

20   you are not required to seek the advice of outside

21   counsel but you have that opportunity to do so to

22   get their input.

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    53

1        Q.    Okay.  And on every claim, part of the

2   adjusting process is to do a coverage analysis and

3   determine whether or not the damage that's being

4   claimed is covered or excluded under a policy,

5   right?

6        A.    That is correct.  That is typically and

7   traditionally part of your file handling and file

8   review, yes.

9        Q.    And sometimes it's really obvious like

10  when a building burns down and sometimes it's more

11  complicated like in our case, correct?

12            MR. O'CONNELL:  Objection.

13       A.    Correct, it varies.  It depends on the

14  file but it can vary from one extreme to the other.

15       Q.    And you would retain counsel if it's a

16  more complicated coverage analysis that you're

17  being asked to do?

18       A.    To clarify again, I wouldn't say I would.

19  It is an option.  Sometimes there may be a coverage

20  question on a file where a the adjustor brings it

21  to, say, my attention.  If I'm comfortable in my

22  answer, that may be enough for us to relay what our

Transcript of Richard Ketaily
Conducted on May 27, 2021                                54

```
 1    thoughts are on that.  I may elevate it to the

 2    person above me to get their input, but I wouldn't

 3    say it's a requirement, I would continue to say

 4    it's an option that's available to us if necessary,

 5    but it isn't always necessary.

 6         Q.    Okay.  And you would not retain coverage

 7    counsel for an opinion if it was a clear-cut yes or

 8    no?

 9              MR. O'CONNELL:  Objection.  You can

10    answer.

11         A.    Okay, thank you.  If the question that was

12    posed to me is apparent by what the policy says,

13    then there may not be a need for outside counsel,

14    that's correct.  Again, it depends on the file and

15    the question at hand.

16         Q.    Neither you nor Kerry Crawford ever

17    visited the loss location, did you?

18         A.    No, that's correct.

19         Q.    In this case the policy calls for using

20    VeriClaim as the adjustor, independent adjustor?

21         A.    I would like -- I can't speak a hundred

22    percent.  Some of the policies do have a nominated
```

55

1   or named adjustor, and then some of the policies

2   don't have one and the carriers that are involved

3   just reach a quick agreement on who to involve in

4   the loss.  I'd have to see the policy.

5       Q.    Okay.  I'm going to pull up the policy,

6   which is Exhibit 3.

7       A.    Sure.

8       Q.    And endorsement number 5, page 39 of 42,

9   it's called assigned loss adjustor and it refers to

10  VeriClaim.  Do you see that?

11      A.    Yeah, we call it nominated adjustor.

12      Q.    Okay.  So the nominated adjustor in this

13  case was VeriClaim and that is consistent between

14  the Endurance policy as well as the Westchester

15  policy, correct?

16      A.    It should be, yes.

17      Q.    And VeriClaim also does business as

18  Sedgwick?

19      A.    Yes, at the time of the loss they were

20  VeriClaim.  I think VeriClaim now has been

21  incorporated or absorbed by Sedgwick.

22      Q.    Okay.  And the reason neither you nor

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    56

1  Mr. Crawford went to the loss is because you relied

2  on Sedgwick to be your eyes and ears on the ground?

3       A.    I actually would phrase that as it depends

4  on the carrier you're working with.  With a carrier

5  like us, typically the adjusters in the office

6  remain in the office, don't travel to sites and

7  typically we'll work, yes, with adjusters out in

8  the field such as Sedgwick.

9       Q.    Okay.  So you're saying that SOMPO

10 adjusters almost never go to do in person

11 inspections, they almost always rely on independent

12 adjusters?

13      A.    Yes, we refer -- we refer to independent

14 adjusters to assist us in the field, that's

15 correct.

16      Q.    And that's true for every case?

17      A.    You broke up, I believe you said for every

18 case, is that correct?

19      Q.    Yeah.  My question is, that's true for

20 every case that you handle?

21      A.    I would say at least 95 or more.  Once in

22 a while if there's a loss that's local, we may be

1   able to go out pre-Covid of course, in that type of

2   situation.  But that really is the exception.

3        Q.    Okay.  So the business model of SOMPO is

4   to have its adjusters make the coverage analysis

5   and the claim decisions separate from the

6   independent adjusters who go and investigate the

7   loss in person?

8        A.    I would say, yes.  Actually I take that

9   back.  I would say those are both components of the

10  actual overall adjustment of the loss.  You have

11  the independent doing the field work and providing

12  the information to the office and then it's our

13  staff adjustor's responsibility to actually adjust

14  the loss from there, address any coverage questions

15  and then substantiate the quantum of the loss.

16       Q.    The independent adjustor also acts as a

17  conduit for communications between both insurances

18  on this risk and the insured, correct?

19       A.    Yes, typically that's correct.

20       Q.    Is the independent adjustor involved in

21  SOMPO's coverage decisions on the case?

22       A.    They are only involved in the gathering of

Transcript of Richard Ketaily
Conducted on May 27, 2021

58

1   the information.  They don't have any decision-

2   making authority when it comes to an actual

3   coverage question.

4       Q.    Do they have any input as far as offering

5   opinions or coverage analysis?

6       A.    Their opinions may be asked, yes.

7       Q.    In this case did Jeff Gervasio offer any

8   opinions as to coverage?

9       A.    I don't recall.  I'd have to look back at

10   the file if we can, if he actually offered opinions

11   to coverage did or if it was limited to just

12   opinions or information regarding the facts of the

13   loss as he saw them.

14       Q.    Did you speak with him on the phone or

15   were your communications limited to the reports

16   that Sedgwick provided?

17       A.    As Kerry handled the file, not myself, I

18   don't recall if I ever spoke to him directly myself

19   either way.

20       Q.    Do you know if Kerry was talking with him

21   on the phone in addition to obtaining these

22   reports?

Transcript of Richard Ketaily
Conducted on May 27, 2021                          59

1      A.    I'm not sure about this claim
2  specifically, but in general it was not uncommon at
3  all for Kerry to speak with an adjustor on the
4  phone.  He used both means of communication quite
5  often.
6      Q.    Budow and Noble offered a coverage opinion
7  that's been withheld as privileged.  Did SOMPO
8  obtain that opinion for the purposes of litigation
9  or as part of its ordinary adjusting practices?
10         MR. O'CONNELL:  Objection to form.  You
11 can answer, Rick, if you know.
12     A.    I don't know.  To my recollection, it was
13 in regards to the actual coverage question or not,
14 not so much litigation, but that's per my
15 recollection.
16     Q.    Okay.  Does SOMPO anticipate litigation
17 even where it hasn't denied a claim?
18         MR. O'CONNELL:  Objection.  It's vague,
19 calls for an opinion.  You can answer if you
20 understand.
21     A.    I understand the question but I don't
22 really know how to formulate the answer because it

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    60

1   just depends on the file.  It depends on the

2   insured and it depends on all those factors.

3        Q.    Okay.

4        A.    Erik, I'm sorry, it's been about an hour,

5   do you mind if we just take a quick break for a

6   minute, just a five minute break?  Would that be

7   okay with you guys?

8        Q.    Yeah, let's do ten minutes.

9               (Off the record.)

10  BY MR. LAWSON:

11       Q.    Mr. Ketaily, how does SOMPO instruct its

12  adjusters on how to do coverage analysis?

13              MR. O'CONNELL:  Objection, foundation.

14  You can answer.

15       A.    I would say instructs is maybe not the

16  right word.  I guess what they expect is that the

17  adjusters will review everything from the loss

18  notice to the information gathered from the

19  independent in the field and/or discussions with

20  the insured or whomever, to review the policy when

21  it comes to is the property covered, what is the

22  peril of loss, is there any potential coverage

1    question with the peril or the property, etcetera,

2    and then the measurement of the loss.

3        Q.    Okay.  Has SOMPO, what has SOMPO done to

4    review the measurement of the loss submitted by the

5    insureds in this case?

6        A.    In this case I'd have to go back to

7    confirm and look at the file real quick.  Typically

8    there's information obtained from the insured, in

9    this case of a builder's risk it could be anything

10   from schedules regarding completions, it could be

11   the involvement of an accountant.  I'd just have to

12   go back to look at the file real quick to see.

13            And again, that's typically what I'd see

14   in a file.

15       Q.    I'm sorry, you broke up there.  I couldn't

16   hear the answer.

17       A.    So typically that's what I would see on a

18   file is I would see a review by the adjuster in the

19   field of the loss information submitted by the

20   insured.  Our adjustor would review it.  In this

21   case there's other markets involved that would

22   review it and sometimes they'd reach out for

1    specialist, like a forensic accountant possibly or

2    a building consultant.

3         Q.    Are SOMPO's adjusters, do they just learn

4    how to do coverage analysis through experience

5    working with people who have more experience doing

6    coverage analysis?

7              MR. O'CONNELL:  Objection.  You can

8    answer.

9         A.    I would say it would depend on the

10   adjustor, adjustor's backgrounds that included

11   specific training with other carriers on coverage

12   reviews, or possibly different sessions, they could

13   be counseled.

14             But once they are at SOMPO for our

15   adjusters we depend on their experience, and on the

16   input with others involved with the file.  There's

17   no formal training program in that regard.

18        Q.    Are there any third party conferences or

19   symposiums that you've attended that deal with

20   doing coverage analysis, going over specific

21   exclusions, anything like that?

22        A.    In my past, yes.

Transcript of Richard Ketaily
Conducted on May 27, 2021                          63

1      Q.    Since you've been working at SOMPO is

2    there anything that you've done --

3      A.    And I'm sorry, Erik, you broke up.  Can

4    you repeat that?

5      Q.    Since you've been at SOMPO have you

6    attended any kind of symposium or conference

7    in person or virtually to do that kind of

8    professional development?

9      A.    Yes, I have attended some conferences for

10   Loss Executives Association.  It's a claims

11   organization.

12     Q.    Can you say that name again?

13     A.    Sure.  Loss Executives Association.  They

14   go by the acronym of LEA.

15     Q.    Okay.  And what did you attend?

16     A.    Pre-Covid they would have two conferences

17   a year that I would attend.  Since Covid they have

18   not had a conference.

19     Q.    Okay.  And can you describe what kind of

20   conference that pre-Covid conference was?

21     A.    It's more or less like a conference where

22   they have a variety of different sessions to speak

1    to different aspects of claim handling.  It could

2    be the latest developments in hurricane losses, it

3    could be reviews of boiler machinery breakdowns, it

4    could different Florida case law.  There's a

5    variety that you have to choose from.

6         Q.    Have you ever taken any kind of course or

7    attended any kind of conference where the dampness

8    or dryness of atmosphere and exclusion was

9    specifically addressed?

10        A.    Not that I recall, no.

11        Q.    In connection with those kinds of

12   conferences would you been given reading material

13   that summarized the coverage analysis based on

14   developments in insurance law?

15        A.    Typically you're given handouts, yes, at a

16   conference for the different sessions.  It depends

17   on the presenters and the topic, I think to what

18   degree of items you're given.  Myself personally, I

19   don't typically hang onto those.  You know, there's

20   been nothing too complex to understand.  I just

21   don't have a library of that information.

22        Q.    Does SOMPO pay for you to attend these

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    65

1    types of conferences or pay you for your time while

2    you're attending those conferences?

3        A.    Well, it's considered work-related.  So

4    they don't pay you specifically to attend, you're

5    still getting your normal compensation like you

6    would if you were at the office.  The membership

7    for LEA is quite nominal and that includes the

8    costs for attending these conferences except for

9    your own expenses.

10       Q.    Does SOMPO cover the membership?

11       A.    Yes, they do.  Most carriers do if you're

12   a member.

13       Q.    And other than LEA, are there any other

14   groups that do that kind of analysis at

15   conferences?

16            MR. O'CONNELL:  Objection.  You can

17   answer.

18       A.    There's, yes, there's other organizations

19   that would more or less they operate that same way.

20   They provide those conferences, if you wish to

21   attend.  There's no other ones that I attend to

22   except LEA.

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    66

1      Q.    Do you know if Mr. Crawford was a member
2  of LEA?
3      A.    Just to clarify, I think you asked me if
4  Mr. Crawford ever attended LEA, correct?
5      Q.    Yes.
6      A.    When he was employed with SOMPO, yes, he
7  did.
8      Q.    Okay.  And do you know if he attended any
9  other professional development conferences similar
10 to LEA?
11     A.    Yes, he attended another series throughout
12 his tenure with us, I'm not sure how many times he
13 went, and the acronym is PLRB.  That stands for
14 Property Loss Research Bureau.
15     Q.    Yeah, is it the Property and Liability
16 Resource Bureau?
17     A.    Erik, I'm sorry, you broke up.
18     Q.    Yeah, is it the Property and Liability
19 Resource Bureau?
20     A.    I know them as PLRB and then the LIRB, the
21 liability side, but I believe we're speaking
22 probably of the same thing.

1      Q.    Okay.  And similarly is SOMPO -- the

2   membership and attendance at PLRB conferences?

3      A.    SOMPO, Kerry he would be considered still

4   working so his salary would still apply while he

5   attends those, and I believe the sessions that he

6   attended while at SOMPO, because he was part of a

7   panel that presented a topic there was no type of

8   admission charge for him, so there's nothing to

9   reimburse.  Does that make sense?

10     Q.    Yes.  The policy also covers mold,

11  correct?

12          MR. O'CONNELL:  Objection.  You can

13  answer.

14     A.    I'd have to look at the policies, but yes,

15  some policies do cover mold, some don't, and some

16  have a sublimit.  It's not unusual.

17     Q.    I'm looking in Exhibit 3, which is the

18  policy, and I'm going to scroll to --

19     A.    Sure.

20     Q.    Okay.  So there's a $100,000 annual

21  sublimit of insurance for limited coverage for

22  fungus, wet rot, dry rot or bacteria.  Do you see

Transcript of Richard Ketaily
Conducted on May 27, 2021                                      68

1    that?

2        A.    Yes, I do see that.

3        Q.    And it's the supplement applies on a per

4    occurrence basis and also has an annual aggregate.

5    Do you see that?

6        A.    Yes, I do.

7        Q.    And under part C, extensions of coverage,

8    there is a paragraph that discusses limited

9    coverage for fungus, wet rot, dry rot or bacteria,

10   correct?

11       A.    Yes, that's what it shows, correct.

12       Q.    And this says that under the extension of

13   coverage the company will pay for direct physical

14   loss to insured property at the insured project

15   caused by fungus where loss, insured project and

16   fungus are all defined terms.  Do you see that?

17       A.    Yes, because they're capitalized.

18       Q.    Why did SOMPO not pay the $100,000 limit

19   for -- well, let me ask you this, is it your

20   understanding that some of the building elements

21   sustained direct physical loss from fungus?

22       A.    From I my recollection I believe there was

1    some.

2         Q.    Why didn't SOMPO pay for that?

3         A.    Well, if you're referring to section B

4    where it states that language, again above it

5    states from section A that it has to result from a

6    covered cause of loss, I believe, or by an

7    occurrence that's covered under the policy.

8         Q.    Okay.  So SOMPO would have paid but for

9    its coverage analysis that it concluded that the

10   occurrence wasn't covered?

11             MR. O'CONNELL:  Objection.  You can

12   answer.

13        A.    That's my understanding, yes.

14        Q.    Do you know of a situation where fungus

15   can grow in the absence of moisture?

16             MR. O'CONNELL:  Objection.  You can

17   answer.

18        A.    No, not in my layman's understanding, no.

19        Q.    And in your experience as a property

20   adjuster you've had many claims that involve mold?

21        A.    I would say I've handled a number of

22   claims, yes, that do involve mold.

Transcript of Richard Ketaily
Conducted on May 27, 2021                                    70

1       Q.    Would you say hundreds of claims where

2   mold was present at the loss location?

3       A.    Over 30 years I don't know the exact

4   number but it could be a hundred.  I'm not sure of

5   the actual number.  It's not unfamiliar to me.

6       Q.    Did SOMPO come up with its own damage

7   measure that's different from the measurements

8   provided by McCullough, the contractor, and also

9   the accountants who have been identified in this

10  case?

11      A.    I don't recall offhand for this file.

12  Typically on a file like this, the market, being

13  the carrier and SOMPO -- I'm sorry, is that okay?

14          Typically on a file like this where there

15  is a market, which is the other carrier and

16  ourselves if we were trying to measure the actual

17  or obtain a loss measurement, we may refer to what

18  the insured has submitted, we may bring in the

19  adjuster again in the field or somebody else to

20  assist us with that.

21          We would not do that through our own

22  adjuster, say, Kerry in this case, no.

Transcript of Richard Ketaily
Conducted on May 27, 2021                                      71

1      Q.    Okay.  Let's talk about the market.  When

2    you use the word market you're referring to the

3    fact that it's more than one insurance company that

4    is contributing to covering the risk?

5      A.    That's correct.

6      Q.    And is there a written agreement between

7    SOMPO and Chubb concerning cases such as this where

8    they are on the same risk?

9            MR. O'CONNELL:  Objection to form.  You

10   can answer if you understand.

11     A.    The way I would answer it, as far as I

12   know there's no written agreement between carriers

13   in general, or in this case us and Chubb,

14   Westchester.

15           The agreement is that we're both following

16   the policy -- I'm pointing to it, sorry.  We're

17   both following the same policy, or one of us is

18   following the other's policy depending on how it's

19   actually written.

20     Q.    Okay.  And so the only agreement is that

21   within each of your policies it says that your

22   contribution is 50 percent on the policy?

1      A.     Yeah, in our policy it'll describe what

2    the participation and it'll, because of the policy

3    itself, it'll either be a manuscript form which we

4    all follow, or it'll be one carrier following the

5    form of the other one or participate in their form.

6      Q.     Okay.  And then does SOMPO or do SOMPO and

7    Chubb split the expenses related to the adjustment

8    of this matter 50-50?

9      A.     Yes, in this case since the coverage

10   assumed is we each have a 50 percent share, then

11   typically if we're agreed on the experts that are

12   retained, we're sharing those expenses with that

13   same 50-50 ratio.

14     Q.     And likewise the payment for Sedgwick, the

15   independent adjuster, would be split 50-50 between

16   the two carriers?

17     A.     Yes, it should be, yes.

18     Q.     All right.  When you participated in the

19   denial decision it was just you and Kerry Crawford

20   initially, correct?

21     A.     I believe so.  I would have to look at the

22   emails to see if I went to anyone above me, but

1  typically it would be Kerry, myself and just the

2  acknowledgment to the underwriter.

3      Q.    Okay.  And did you coordinate your

4  coverage decision with Chubb?

5      A.    I believe so, yes.  Typically if you are

6  on a market, participating in a market, and the

7  market, because they're looking at the same forms

8  for the most part, should be consistent.  So we did

9  on this one I believe as well as.

10     Q.    Did you speak with a Chubb adjuster

11 directly or was it all through Kerry?

12     A.    On this particular project or claim I

13 don't recall speaking to anyone with the other

14 carrier.

15            I do want to point out just to clarify

16 that, I did recall Linda Parham being on this file

17 to assist at one point but that was for our

18 benefit, us and not Westchester.

19     Q.    And Linda is another SOMPO adjuster,

20 correct?

21     A.    Yes, she was actually a contract employee.

22 She was contracted for six months just to assist.

```
 1    And so her involvement in this file I believe it
 2    was when Kerry must have been out on vacation for a
 3    short time, because she has very limited
 4    involvement.
 5        Q.    Was this her only contract or did she have
 6    more claims that she was handling?
 7        A.    This was her only contract with SOMPO, but
 8    during that six months she handled a number of
 9    files with us, not just this one.  Was that your
10    question?  I'm sorry.
11        Q.    Yeah.  When you say she was a contractor
12    you mean that she was not a full-time employee,
13    she's a 1099?
14        A.    Correct.  She had retired from another
15    carrier so we just had the need for a temporary
16    employee so she came in as a contract 1099, as you
17    put it.
18        Q.    Okay.  And do you know what her employment
19    background was?
20        A.    This is just from recollection, she had
21    actually worked at Ace and then Chubb, I believe
22    for ten plus years as part of her employment before
```

1   she retired.  And then when she required, within a

2   couple of months is when she came over as a

3   contract employee with us for that six month time

4   frame.

5       Q.    Okay.  And before working for -- how long

6   did Kerry Crawford work for SOMPO?

7       A.    I believe he came over to SOMPO around

8   2016.

9       Q.    Do you know where he was before that?

10      A.    Before that he actually was with Maxum

11  Specialty, one of my previous employers.  And prior

12  to that I believe he was with State Farm for

13  twenty-plus years.

14      Q.    Is it possible when you have a market for

15  the carriers to reach different coverage opinions?

16          MR. O'CONNELL:  Objection as to what is

17  possible.  You can answer.

18      A.    Certainly, yes.  Not often -- sorry, go

19  ahead.

20      Q.    Right, not often, and you were clarifying.

21          So what would happen if Chubb had reached,

22  in its coverage analysis that this claim was

1    covered and SOMPO reached the opposite conclusion?

2            MR. O'CONNELL:  Objection, hypothetical.

3    You can answer.

4       A.    One of two ways it would be communicated

5    to the insured is that, you know, communication

6    explaining what participation each carrier has

7    under their policy so they understand that

8    breakdown, and then the carriers typically would

9    either through the adjuster or through themselves

10   would draft a letter to explain their respective

11   positions.  Sometimes those letters go out

12   separately, one for each carrier, sometimes the

13   carriers may opt to have the independent adjuster

14   have one letter explaining two positions.  And the

15   carrier that is accepting coverage would be

16   responsible for their proportionate share of the

17   loss, and the other carrier's denying their share,

18   and then wherever it goes from there.

19      Q.    Okay.  Do you know if either Kerry or

20   Linda discussed the coverage analysis with Chubb?

21      A.    I don't know about Linda because her

22   involvement was so limited, but possibly.  But

1    certainly Kerry would have, market files, there's

2    usually a number of conversations with the overall

3    status of the file with or without the independent.

4        Q.    Okay.  I'm going to show you the

5    reservation of rights letters.  Can you see that

6    now?

7        A.    From Sedgwick, yes.

8        Q.    Okay, and that's marked as Exhibit 4.

9              Were you involved in the drafting of this

10   reservation of rights?

11       A.    I don't know if I was involved with this

12   letter that went out under Sedgwick.  I do recall

13   at one point there was a reservation of rights

14   drafted just on behalf of SOMPO.  And I believe I

15   was involved in that review and offered my

16   comments.

17       Q.    Okay.  And this, is this reservation of

18   rights is on behalf of both SOMPO and Chubb,

19   correct?

20       A.    Yes, we refer to that as on behalf of the

21   market.

22       Q.    Okay.  And I'll bring up what we'll call

Transcript of Richard Ketaily
Conducted on May 27, 2021                                78

1    Exhibit 5 is the July 16th, 2019 letter from

2    Sedgwick to the insured and their contractor,

3    Mr. Goodman.  Did you participate in the drafting

4    of this denial letter?

5        A.    I don't recall specifically.

6        Q.    Okay.  Did you review it before it went

7    out?

8        A.    Typically I would, yes.

9        Q.    Would you have been the one, would you, or

10   Mr. Crawford or Linda, would any of them, any of

11   you be able to authorize this letter to go out on

12   behalf of SOMPO?

13       A.    Typically any one of us could have in the

14   file handling.  Again, Linda I'm just not so sure

15   because her time was so short.  Typically it would

16   be the adjuster, would be Kerry.

17       Q.    And this letter was approved to go out on

18   behalf of SOMPO, correct?

19       A.    I believe so, yes.

20       Q.    And then I'm going to show you what we'll

21   mark as Exhibit 6, this is an August 7th, 2019

22   denial letter and it's in response to July 18, 2019

1    correspondence which was in response to the letter

2    that we just read which was July 16th, 2019.

3            Same questions for this one.  Would this

4    letter have been reviewed and approved by SOMPO

5    before it was issued?

6        A.   Yes, typically it needs to be reviewed by

7    the actual adjuster and then elevated to the

8    manager if need be.  But it should be at least, we

9    ask that it's reviewed at least by the adjuster for

10   our input and our approval.

11       Q.   And this was sent on SOMPO's behalf with

12   SOMPO's authorization?

13       A.   I believe so, that's correct.

14       Q.   All right.  If you don't mind, I'd like to

15   take just a five minute break and review my notes

16   and see if I have anything else.

17       A.   That's fine.

18            (Off the record.)

19   BY MR. LAWSON:  All right, just a couple more

20   questions.

21       Q.   All right.  I'm going to show you the

22   first denial letter which is Exhibit 6, this is the

Transcript of Richard Ketaily
Conducted on May 27, 2021                    80

1  July 16th one.  Do you see that?

2          MR. O'CONNELL:  I think that's Exhibit 5,

3  Erik.

4          MR. LAWSON:  I thought the reservation of

5  rights letter was Exhibit 5.

6          MR. O'CONNELL:  I have that as Exhibit 4.

7  I have the policy as 3.

8  BY MR. LAWSON:  You're right, you're right.  Okay.

9  So this is Exhibit 5.

10     Q.    And the point I wanted to direct you to is

11 this line here.  It says, per the above the

12 insurers have instructed Sedgwick to inform you

13 that the policy will not respond to any related

14 costs for the water damage discovered at the loss

15 location.

16          If the policy covers water damage why did

17 Sedgwick or why did the insurers instruct Sedgwick

18 to deny the costs related to the water damage?

19          MR. O'CONNELL:  Objection, the letter

20 speaks for itself.  You can answer, and if you need

21 to review the entire letter, please let counsel

22 know.

Transcript of Richard Ketaily
Conducted on May 27, 2021                     81

1      A.      I think in my opinion the term or the

2  phrasing here water damage is not the probably

3  appropriate term to use.  I believe what it would

4  have said and should have said was that the policy

5  will not respond to any related costs to the damage

6  being covered at the loss location, not

7  specifically just the water damage.

8      Q.      Okay.  So you think that the letter

9  misspeaks when it calls it water damage?

10     A.      I think it could have been termed in a

11 different way which was more appropriate.

12     Q.      Okay.  And is there a difference in your

13 mind between water damage and moisture damage?

14         MR. O'CONNELL:  Objection.  You can

15 answer.

16     A.      In my mind there is.  You know, again, I

17 think we touched on this earlier, where water

18 damage to me is you actually have physical water

19 from a source like, whether it's an opening in the

20 roof where rain comes in or a pipe and water's

21 damaging something like drywall, versus moisture,

22 which is just in the air, I'm going to say almost a

Transcript of Richard Ketaily
Conducted on May 27, 2021                    82

1    gas that turns into more like a liquid.  So there

2    is a difference to a certain extent, yes.

3        Q.    Okay.  But if something was wetted by

4    liquid water then it's covered under the policy?

5            MR. O'CONNELL:  Objection to form.  You

6    can answer.

7        A.    If something is wet from water it may be

8    covered, you know, under a policy.  You might not

9    have coverage for flood, you might not have

10   coverage for, you know, water that's leaked more

11   than 14 days.  But in general, there is a

12   possibility that it's covered.

13       Q.    In this policy both flood and water damage

14   are covered, right?

15           MR. O'CONNELL:  Objection, you can answer.

16       A.    Yes, the policy states there is coverage

17   for water damage and flood, subject to certain

18   exclusions or limitations.

19           MR. LAWSON:  All right.  I have no further

20   questions.

21   BY MR. O'CONNELL:  I do just have a few follow-up

22   questions.

1      Q.    Do you recall whether or not the insureds

2    were represented by the a public adjuster in

3    connection with this claim?

4      A.    I know that the three Gs were involved but

5    I thought it was -- well, my understanding was that

6    I thought that the three Gs or one of the three Gs,

7    one of the principals there was involved with the

8    project in general, but as far as representing the

9    insured, I don't believe that came into play until

10   later on during the adjustment.

11     Q.    And do you recall after the initial

12   reservation of rights letter was sent out whether a

13   response was received from the insured's public

14   adjuster?

15     A.    I believe at that point after one of the

16   letters went out to the insured, I know the public

17   adjuster provided more information or provided a

18   response to it which the carriers reviewed and then

19   they responded to.

20     Q.    And do you recall in any of the public

21   adjuster's response letters, did he attempt to

22   interpret the policy provisions that were cited in

1    the reservation of rights or the denial letters in

2    response to position being taken by the market?

3        A.    I believe so, yes.

4        Q.    Okay.  Now were you involved in the

5    decision to retain coverage counsel?

6        A.    I do recall, yes, I do recall Kerry asking

7    me about coverage counsel, that Chubb had

8    recommended because there was a question regarding

9    coverage.  And typically he would, in this scenario

10   typically he would have to come to me to sign off

11   and say, that's fine, go ahead, retain counsel.

12       Q.    And do you recall what the issue was that

13   was raised by Chubb as to why they believed

14   coverage counsel should become involved?

15       A.    At the time I don't recall specifically if

16   it was the actual cost of making good, the lacking

17   or absence of the actual material, or it was the

18   actual moisture versus water.  It was one of the

19   two or possibly both.

20            MR. O'CONNELL:  Okay.  I don't have any

21   further questions.

22            MR. LAWSON:  I have no further.

1          COURT REPORTER:  Did we want the exhibits

2     attached to the transcript?

3          MR. LAWSON:  I'll upload those now.

4          COURT REPORTER:  I can take transcript

5     orders now if anyone would like a copy of the

6     transcript.

7          MR. LAWSON:  I do.  Are you waiving

8     reading and signing?

9          MR. O'CONNELL:  No, he's going to review

10    and sign.  I'm not getting a copy.

11         COURT REPORTER:  Mr. Ketaily, could I have

12    your email address, please so we have a place to

13    send your read and sign copy?

14         THE WITNESS:  Sure.  It's first initial,

15    last name so it's rketaily@sompo-intl.com.

16         COURT REPORTER:  Okay, thank you.

17         MR. LAWSON:  Okay, thank you.

18         COURT REPORTER:   Thanks, everyone.

19         (Off the record at 12:03 p.m.)

20

21

22

Transcript of Richard Ketaily
Conducted on May 27, 2021                              86

1              CERTIFICATE OF DEPONENT

2

3        I hereby certify that I have read and examined

4    the aforegoing transcript, and the same is a true

5    and accurate record of the testimony given by me.

6        Any records or corrections the I feel are

7    necessary, I will make on the enclosed Errata Sheet

8    which will be attached to the transcript.

9

10

11

12        _____

13        Richard Ketaily

14

15        _____

16        Date

17

18

19

20

21

22

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2      I, Lynne Livingston, the officer before whom

3  the foregoing deposition was taken, do hereby

4  certify that the foregoing transcript is a true and

5  correct record of the testimony given; that said

6  testimony was taken by me stenographically and

7  thereafter reduced to typewriting under my

8  supervision; and that I am neither counsel for or

9  related to, nor employed by any of the parties to

10  this case and have no interest, financial or

11  otherwise, in its outcome.

12      IN WITNESS WHEREOF, I have hereunto set my hand

13  and affixed my notarial seal this 9th day of June,

14  2021.

15      My commission expires January 6, 2023

16

17

18

19  _____

20  NOTARY PUBLIC IN AND FOR

21  THE STATE OF MARYLAND

22

Transcript of Richard Ketaily
Conducted on May 27, 2021

88

| A | | | |
|---|---|---|---|
| **ability** | **activate** | **adjusters** | **after** |
| 50:18, 50:19 | 32:22 | 51:13, 56:5, | 10:22, 15:2, |
| **able** | **acts** | 56:7, 56:10, | 15:14, 33:22, |
| 57:1, 78:11 | 57:16 | 56:12, 56:14, | 38:15, 38:19, |
| **about** | **actual** | 57:4, 57:6, | 83:11, 83:15 |
| 14:2, 15:12, | 17:7, 21:19, | 60:12, 60:17, | **again** |
| 17:7, 24:1, | 24:15, 24:16, | 62:3, 62:15 | 25:5, 26:21, |
| 25:20, 32:2, | 25:6, 25:9, | **adjusting** | 33:7, 34:9, |
| 33:8, 35:4, | 27:18, 33:20, | 52:4, 52:7, | 35:8, 36:20, |
| 37:6, 37:10, | 48:15, 57:10, | 53:2, 59:9 | 41:17, 52:7, |
| 48:11, 51:13, | 58:2, 59:13, | **adjustment** | 53:18, 54:14, |
| 52:9, 59:1, | 70:5, 70:16, | 57:10, 72:7, | 61:13, 63:12, |
| 60:4, 71:1, | 79:7, 84:16, | 83:10 | 69:4, 70:19, |
| 76:21, 84:7 | 84:17, 84:18 | **adjustor** | 78:14, 81:16 |
| **above** | **actually** | 7:6, 7:8, 8:5, | **agency** |
| 11:15, 19:15, | 8:9, 12:11, | 9:8, 15:5, 15:9, | 43:3 |
| 54:2, 69:4, | 31:11, 45:18, | 30:19, 31:6, | **aggregate** |
| 72:22, 80:11 | 56:3, 57:8, | 40:19, 50:6, | 68:4 |
| **absence** | 57:13, 58:10, | 50:7, 53:20, | **agree** |
| 11:2, 30:20, | 71:19, 73:21, | 54:20, 55:1, | 25:13, 25:14, |
| 31:8, 31:19, | 74:21, 75:10, | 55:9, 55:11, | 25:21, 25:22, |
| 69:15, 84:17 | 81:18 | 55:12, 57:16, | 35:3, 35:20, |
| **absorbed** | **add** | 57:20, 59:3, | 36:4 |
| 55:21 | 43:19 | 61:20, 62:10 | **agreed** |
| **accepting** | **addition** | **adjustor's** | 72:11 |
| 76:15 | 58:21 | 7:5, 57:13, | **agreement** |
| **accessible** | **address** | 62:10 | 55:3, 71:6, |
| 48:15 | 45:15, 57:14, | **administration** | 71:12, 71:15, |
| **account** | 85:12 | 7:18 | 71:20 |
| 42:16, 42:18 | **addressed** | **administrator** | **ahead** |
| **accountant** | 64:9 | 8:18, 9:19 | 9:13, 21:5, |
| 61:11, 62:1 | **adheres** | **admission** | 29:10, 75:19, |
| **accountants** | 22:17 | 67:8 | 84:11 |
| 70:9 | **adjust** | **advance** | **air** |
| **accumulation** | 57:13 | 41:4 | 22:3, 22:10, |
| 27:10 | **adjusted** | **advice** | 24:13, 24:18, |
| **accurate** | 15:1, 15:3 | 52:20 | 24:20, 25:3, |
| 86:5 | **adjuster** | **advices** | 81:22 |
| **ace** | 50:12, 52:8, | 41:17 | **all** |
| 74:21 | 61:18, 69:20, | **advise** | 15:11, 20:14, |
| **acknowledgement** | 70:19, 70:22, | 41:16 | 21:5, 26:6, |
| 41:15 | 72:15, 73:10, | **advised** | 27:22, 28:11, |
| **acknowledgment** | 73:19, 76:9, | 41:20, 41:21 | 32:4, 32:20, |
| 41:1, 41:4, | 76:13, 78:16, | **affects** | 35:5, 35:21, |
| 73:2 | 79:7, 79:9, | 39:4 | 36:5, 36:11, |
| **acronym** | 83:2, 83:14, | **affixed** | 36:16, 38:10, |
| 63:14, 66:13 | 83:17 | 87:13 | 39:1, 50:4, |
| | **adjuster's** | **aforegoing** | 50:7, 50:9, |
| | 83:21 | 86:4 | |

50:14, 52:16,
59:3, 60:2,
68:16, 72:4,
72:18, 73:11,
79:14, 79:19,
79:21, 82:19
**all-risk**
20:6, 20:9,
20:12, 20:13,
20:17, 20:21
**allows**
18:11, 22:1,
22:14
**almost**
48:5, 51:16,
56:10, 56:11,
81:22
**along**
23:2, 35:9,
52:19
**alpharetta**
8:12, 8:15
**already**
21:4
**also**
5:14, 7:10,
9:8, 16:18,
27:21, 28:17,
43:13, 46:22,
50:10, 55:17,
57:16, 67:10,
68:4, 70:8
**although**
30:4
**always**
29:9, 47:2,
54:5, 56:11
**amended**
5:16, 17:11
**american**
1:12, 4:12,
19:5
**analysis**
51:12, 51:14,
52:2, 52:5,
52:11, 53:2,
53:16, 57:4,
58:5, 60:12,

62:4, 62:6,
62:20, 64:13,
65:14, 69:9,
75:22, 76:20
**annual**
67:20, 68:4
**another**
34:4, 66:11,
73:19, 74:14
**answer**
6:18, 13:15,
16:3, 16:9,
16:15, 17:19,
19:2, 20:2,
20:11, 21:14,
22:7, 22:22,
23:8, 24:4,
25:19, 28:7,
28:14, 31:1,
31:2, 31:10,
32:9, 33:6,
33:13, 33:19,
34:7, 34:19,
35:7, 36:1,
36:7, 36:13,
36:19, 39:2,
39:14, 40:3,
40:11, 40:13,
42:13, 42:22,
43:10, 46:7,
46:18, 47:7,
52:13, 53:22,
54:10, 59:11,
59:19, 59:22,
60:14, 61:16,
62:8, 65:17,
67:13, 69:12,
69:17, 71:10,
71:11, 75:17,
76:3, 80:20,
81:15, 82:6,
82:15
**answered**
39:9
**anti-concurrent**
29:12, 29:17,
30:8, 30:16,
30:21, 31:8,

31:13, 31:20
**anticipate**
59:16
**any**
7:12, 7:15,
9:3, 11:14,
15:4, 19:14,
20:16, 20:21,
20:22, 23:21,
24:7, 27:10,
29:22, 30:2,
30:3, 30:5,
34:1, 37:7,
38:10, 38:14,
41:11, 42:6,
51:6, 51:11,
57:14, 58:1,
58:4, 58:7,
60:22, 62:18,
63:6, 64:6,
64:7, 65:13,
66:8, 78:10,
78:13, 80:13,
81:5, 83:20,
84:20, 86:6,
87:9
**anybody**
15:8
**anyone**
41:13, 72:22,
73:13, 85:5
**anything**
15:7, 23:13,
37:1, 39:4,
48:14, 48:18,
52:19, 61:9,
62:21, 63:2,
79:16
**apart**
33:1, 33:10,
44:5
**apologize**
9:13, 21:5
**apparent**
54:12
**appear**
17:1, 26:15,
36:10, 36:16

**appears**
40:15
**appetite**
43:5
**applicability**
52:3
**applicable**
7:11, 37:9,
52:10, 52:19
**applies**
29:21, 30:9,
30:13, 30:20,
31:7, 68:3
**apply**
28:19, 34:2,
47:1, 67:4
**appropriate**
81:3, 81:11
**approval**
16:7, 42:1,
79:10
**approvals**
41:18
**approved**
16:8, 78:17,
79:4
**approximately**
6:7
**area**
23:10, 49:14
**areas**
6:15, 6:19
**around**
9:15, 9:17,
24:18, 44:11,
75:7
**asked**
11:1, 53:17,
58:6, 66:3
**asking**
24:7, 45:9,
84:6
**asks**
17:16
**aspects**
64:1
**assets**
37:20

Transcript of Richard Ketaily
Conducted on May 27, 2021

90

| | | | |
|---|---|---|---|
| **assigned**<br>10:14, 40:20,<br>55:9<br>**assigning**<br>10:13, 11:12,<br>14:22<br>**assignment**<br>15:15<br>**assist**<br>11:1, 15:3,<br>51:21, 56:14,<br>70:20, 73:17,<br>73:22<br>**assistant**<br>9:1, 11:4,<br>11:7, 12:9,<br>12:11<br>**assisting**<br>11:12<br>**associated**<br>6:21<br>**association**<br>63:10, 63:13<br>**assume**<br>26:3, 43:14<br>**assumed**<br>72:10<br>**atlanta**<br>8:9, 8:18<br>**atlantic**<br>8:8, 13:1<br>**atmosphere**<br>21:18, 23:2,<br>23:5, 23:9,<br>25:10, 30:14,<br>40:9, 64:8<br>**attached**<br>4:8, 5:3, 6:15,<br>37:8, 85:2, 86:8<br>**attempt**<br>83:21<br>**attend**<br>63:15, 63:17,<br>64:22, 65:4,<br>65:21<br>**attendance**<br>67:2<br>**attended**<br>62:19, 63:6, | 63:9, 64:7,<br>66:4, 66:8,<br>66:11, 67:6<br>**attending**<br>65:2, 65:8<br>**attends**<br>67:5<br>**attention**<br>15:16, 53:21<br>**august**<br>4:15, 78:21<br>**authorities**<br>11:14<br>**authority**<br>43:15, 43:19,<br>58:2<br>**authority-wise**<br>44:2<br>**authorization**<br>79:12<br>**authorize**<br>78:11<br>**automatically**<br>50:11<br>**available**<br>48:22, 54:4<br>**aware**<br>30:19, 39:5,<br>41:5, 41:15,<br>42:7, 43:22,<br>48:14, 51:10<br><hr>**B**<br>**bachelor's**<br>7:17<br>**back**<br>10:18, 15:13,<br>15:20, 25:13,<br>28:22, 32:7,<br>32:14, 34:21,<br>47:22, 57:9,<br>58:9, 61:6,<br>61:12<br>**background**<br>7:14, 74:19<br>**backgrounds**<br>62:10<br>**bacteria**<br>67:22, 68:9 | **bad**<br>49:16<br>**barrier**<br>18:3, 18:7,<br>18:10, 18:18,<br>19:20, 19:22,<br>21:9, 21:17,<br>21:22, 22:14,<br>23:11, 23:12<br>**based**<br>10:4, 10:7,<br>26:2, 36:8,<br>36:14, 36:20,<br>64:13<br>**basis**<br>51:22, 68:4<br>**because**<br>10:13, 11:22,<br>19:21, 21:3,<br>25:16, 26:4,<br>29:20, 34:13,<br>56:1, 59:22,<br>67:6, 68:17,<br>72:2, 73:7,<br>74:3, 76:21,<br>78:15, 84:8<br>**become**<br>84:14<br>**been**<br>5:7, 8:2, 10:4,<br>16:22, 32:21,<br>55:20, 59:7,<br>60:4, 63:1,<br>63:5, 64:12,<br>64:20, 70:9,<br>74:2, 78:9,<br>79:4, 81:10<br>**before**<br>2:21, 5:19,<br>6:4, 6:14,<br>74:22, 75:5,<br>75:9, 75:10,<br>78:6, 79:5, 87:2<br>**beginning**<br>9:6, 32:15<br>**begins**<br>27:6<br>**behalf**<br>3:3, 3:13, | 17:2, 77:14,<br>77:18, 77:20,<br>78:12, 78:18,<br>79:11<br>**being**<br>14:10, 16:5,<br>16:6, 22:9,<br>24:2, 43:20,<br>51:4, 53:3,<br>53:17, 70:12,<br>73:16, 81:6,<br>84:2<br>**believe**<br>7:9, 8:8, 8:13,<br>9:15, 9:17,<br>10:11, 10:19,<br>10:22, 15:14,<br>15:19, 16:12,<br>16:16, 17:5,<br>20:8, 22:20,<br>23:1, 23:16,<br>30:18, 35:9,<br>40:13, 41:13,<br>42:10, 46:8,<br>56:17, 66:21,<br>67:5, 68:22,<br>69:6, 72:21,<br>73:5, 73:9,<br>74:1, 74:21,<br>75:7, 75:12,<br>77:14, 78:19,<br>79:13, 81:3,<br>83:9, 83:15,<br>84:3<br>**believed**<br>84:13<br>**benefit**<br>73:18<br>**best**<br>51:15<br>**better**<br>42:18, 50:21<br>**between**<br>7:7, 12:8,<br>13:12, 13:18,<br>14:3, 14:20,<br>21:11, 24:10,<br>28:10, 30:5, |

Transcript of Richard Ketaily
Conducted on May 27, 2021

91

55:13, 57:17,
71:6, 71:12,
72:15, 81:13
**biggest**
14:5, 14:19
**bit**
7:16
**blow**
33:1
**boiler**
64:3
**bold**
26:22
**bolded**
26:9, 29:3,
29:15, 30:10
**both**
13:2, 13:10,
17:2, 25:15,
25:22, 26:3,
57:9, 57:17,
59:4, 71:15,
71:17, 77:18,
82:13, 84:19
**br**
26:13
**break**
24:16, 25:8,
60:5, 60:6,
79:15
**breakdown**
76:8
**breakdowns**
47:19, 64:3
**breakup**
48:6
**bring**
28:22, 70:18,
77:22
**brings**
53:20
**broke**
7:16, 20:19,
45:6, 47:20,
56:17, 61:15,
63:3, 66:17
**broker**
41:1, 41:16,

43:2
**brought**
15:16
**brown**
3:5
**budow**
59:6
**builder**
32:12, 44:22,
45:1
**builder's**
13:3, 14:7,
39:6, 61:9
**builders**
14:7, 44:16
**building**
14:8, 14:9,
14:10, 14:18,
18:17, 21:10,
21:19, 21:20,
22:2, 22:4,
22:8, 22:10,
22:15, 22:16,
22:17, 23:10,
23:14, 25:5,
25:11, 27:11,
32:5, 32:7,
33:16, 33:22,
34:16, 53:10,
62:2, 68:20
**bulletins**
47:18
**bunch**
33:1
**bureau**
66:14, 66:16,
66:19
**burns**
53:10
**business**
7:18, 7:22,
48:9, 55:17,
57:3

**C**

**california**
8:5
**call**
55:11, 77:22

**called**
5:7, 29:5,
38:4, 55:9
**calls**
54:19, 59:19,
81:9
**came**
11:18, 33:9,
39:18, 74:16,
75:2, 75:7, 83:9
**can't**
44:19, 54:21
**cap**
1:4, 5:13
**capacity**
12:20
**capitalize**
26:22
**capitalized**
26:6, 26:10,
26:19, 68:17
**capitals**
26:15
**carrier**
56:4, 70:13,
70:15, 72:4,
73:14, 74:15,
76:6, 76:12,
76:15
**carrier's**
76:17
**carriers**
23:17, 55:2,
62:11, 65:11,
71:12, 72:16,
75:15, 76:8,
76:13, 83:18
**case**
1:8, 14:21,
16:22, 18:1,
27:1, 40:19,
40:21, 41:7,
42:5, 51:22,
53:11, 54:19,
55:13, 56:16,
56:18, 56:20,
57:21, 58:7,
61:5, 61:6,

61:9, 61:21,
64:4, 70:10,
70:22, 71:13,
72:9, 87:10
**cases**
71:7
**casualty**
8:5, 8:11
**cat**
48:16, 49:2,
49:8, 49:10,
49:18, 49:20
**categorize**
18:9
**causation**
29:12, 29:18,
30:8, 30:17,
30:21, 31:8,
31:14, 31:20
**cause**
17:22, 18:6,
18:8, 25:6,
30:2, 31:16,
31:19, 31:22,
34:3, 52:18,
69:6
**caused**
20:22, 21:9,
21:10, 22:11,
28:1, 29:21,
39:20, 40:8,
68:15
**causes**
24:13, 29:2,
29:16, 40:15
**causing**
24:17, 49:17
**cell**
45:18, 45:19,
45:21
**certain**
39:15, 39:16,
46:22, 49:13,
82:2, 82:17
**certainly**
75:18, 77:1
**certificate**
86:1, 87:1

Transcript of Richard Ketaily
Conducted on May 27, 2021

certify
86:3, 87:4
change
50:4
changed
11:16, 11:20,
12:13
changes
40:9
charge
12:9, 67:8
choose
64:5
chronological
8:2
chubb
71:7, 71:13,
72:7, 73:4,
73:10, 74:21,
75:21, 76:20,
77:18, 84:7,
84:13
cited
83:22
claim
7:5, 7:11,
10:14, 10:17,
15:11, 15:14,
16:1, 16:4,
16:6, 16:11,
16:17, 50:2,
50:10, 50:13,
51:3, 51:19,
53:1, 57:5,
59:1, 59:17,
64:1, 73:12,
75:22, 83:3
claimed
53:4
claims
8:7, 8:12,
8:20, 9:2, 9:9,
9:21, 10:14,
11:5, 11:10,
11:12, 12:10,
12:12, 12:16,
12:18, 12:21,
12:22, 13:2,

13:3, 13:6,
44:6, 45:4,
48:13, 48:18,
49:6, 49:15,
50:17, 63:10,
69:20, 69:22,
70:1, 74:6
clarification
17:16
clarify
9:11, 9:14,
11:6, 34:20,
36:2, 37:11,
38:5, 38:14,
49:7, 50:21,
53:18, 66:3,
73:15
clarifying
75:20
classification
50:3
classified
33:22
classify
49:11
clause
29:16
clear-cut
54:7
click
35:17
code
49:8, 49:10,
49:18, 49:20
codes
49:2
college
7:15, 7:17
columbia
1:2
com
85:15
come
16:7, 70:6,
84:10
comes
14:6, 58:2,
60:21, 81:20

comfortable
53:21
coming
32:17
comments
15:20, 77:16
commercial
13:2, 13:10,
14:11, 46:8,
46:19
commission
87:15
communicated
17:1, 17:8,
76:4
communication
59:4, 76:5
communications
57:17, 58:15
companies
52:15
company
1:10, 1:13,
8:8, 8:11, 8:15,
8:17, 8:20,
9:18, 9:20,
10:2, 11:7,
11:22, 19:5,
46:1, 68:13,
71:3
company's
47:12
compensation
65:5
completed
14:11
completions
61:10
complex
64:20
complicated
53:11, 53:16
component
25:4
components
57:9
composed
37:13

concern
52:8
concerning
17:14, 71:7
concluded
69:9
conclusion
76:1
concurrently
30:3
condensation
18:4, 18:11,
22:17, 22:19,
23:1, 23:3,
35:4, 35:15,
35:21, 36:5,
46:15, 47:1
condensed
21:10
condition
21:22, 39:17
conditions
19:15, 39:11,
39:16
conducted
1:17, 2:1
conduit
57:17
conference
63:6, 63:18,
63:20, 63:21,
64:7, 64:16
conferences
62:18, 63:9,
63:16, 64:12,
65:1, 65:2,
65:8, 65:15,
65:20, 66:9,
67:2
confirm
10:18, 38:20,
61:7
connection
64:11, 83:3
connections
32:6
consider
43:3, 51:20

Transcript of Richard Ketaily
Conducted on May 27, 2021

93

**considered**
18:18, 42:15,
65:3, 67:3
**considering**
13:22
**consistent**
26:18, 55:13,
73:8
**constitute**
19:20
**construction**
1:6, 5:14,
14:9, 14:14,
14:19, 26:14
**consultant**
62:2
**contact**
45:8, 45:10
**contain**
36:3, 36:5
**contains**
33:16, 38:9
**continue**
54:3
**continued**
46:3
**continuous**
46:10, 46:21
**contract**
26:13, 73:21,
74:5, 74:7,
74:16, 75:3
**contracted**
73:22
**contractor**
32:4, 70:8,
74:11, 78:2
**contribute**
41:19
**contributed**
21:17, 21:19
**contributes**
30:3
**contributing**
71:4
**contribution**
71:22
**control**
37:20

**conversations**
77:2
**coordinate**
73:3
**copy**
5:16, 85:5,
85:10, 85:13
**correct**
10:3, 10:6,
17:17, 18:19,
20:7, 20:8,
20:18, 21:2,
21:12, 24:6,
27:17, 28:9,
28:12, 30:7,
32:8, 33:4,
33:17, 34:5,
34:17, 35:13,
35:14, 36:8,
36:14, 36:20,
37:2, 37:14,
37:16, 37:22,
38:1, 39:12,
40:1, 49:19,
53:6, 53:11,
53:13, 54:14,
54:18, 55:15,
56:15, 56:18,
57:18, 57:19,
66:4, 67:11,
68:10, 68:11,
71:5, 72:20,
73:20, 74:14,
77:19, 78:18,
79:13, 87:5
**corrections**
86:6
**correspondence**
7:7, 79:1
**cost**
18:14, 19:7,
19:11, 19:12,
32:2, 32:7,
33:11, 34:17,
84:16
**costs**
33:2, 65:8,
80:14, 80:18,

81:5
**cotton**
3:15
**could**
13:3, 24:15,
37:5, 43:5,
44:18, 50:13,
61:9, 61:10,
62:12, 64:1,
64:3, 64:4,
70:4, 78:13,
81:10, 85:11
**couldn't**
61:15
**counsel**
6:22, 51:21,
52:4, 52:11,
52:21, 53:15,
54:7, 54:13,
80:21, 84:5,
84:7, 84:11,
84:14, 87:8
**counseled**
62:13
**couple**
75:2, 79:19
**course**
15:7, 57:1,
64:6
**court**
1:1, 85:1,
85:4, 85:11,
85:16, 85:18
**cover**
14:16, 20:9,
27:15, 32:17,
33:2, 39:21,
43:13, 65:10,
67:15
**coverage**
11:13, 14:6,
15:4, 15:16,
16:5, 17:14,
23:22, 24:8,
28:10, 28:11,
29:1, 38:9,
41:3, 43:20,
47:18, 51:12,

51:14, 52:1,
52:5, 52:11,
52:17, 53:2,
53:16, 53:19,
54:6, 57:4,
57:14, 57:21,
58:3, 58:5,
58:8, 58:11,
59:6, 59:13,
60:12, 60:22,
62:4, 62:6,
62:11, 62:20,
64:13, 67:21,
68:7, 68:9,
68:13, 69:9,
72:9, 73:4,
75:15, 75:22,
76:15, 76:20,
82:9, 82:10,
82:16, 84:5,
84:7, 84:9,
84:14
**coverages**
13:20, 13:21,
14:6, 37:9,
43:4, 48:4,
48:11
**covered**
14:12, 24:20,
24:21, 25:8,
33:11, 34:5,
34:22, 35:1,
40:5, 53:4,
60:21, 69:6,
69:7, 69:10,
76:1, 81:6,
82:4, 82:8,
82:12, 82:14
**covering**
43:7, 71:4
**covers**
20:12, 20:13,
20:21, 25:15,
25:22, 26:3,
28:11, 39:11,
39:15, 67:10,
80:16
**covid**
63:17

Transcript of Richard Ketaily
Conducted on May 27, 2021

94

crack
39:21
crawford
8:17, 9:18,
10:1, 10:15,
13:7, 41:9,
44:7, 54:16,
56:1, 66:1,
66:4, 72:19,
75:6, 78:10
created
22:10
creates
18:10, 21:22,
22:16

D

damage
19:20, 21:9,
21:20, 22:11,
24:2, 24:11,
24:12, 24:14,
24:17, 25:12,
25:15, 26:1,
26:7, 27:22,
28:5, 28:11,
32:16, 32:17,
33:2, 33:11,
33:14, 33:20,
33:21, 34:3,
34:4, 39:22,
53:3, 70:6,
80:14, 80:16,
80:18, 81:2,
81:5, 81:7,
81:9, 81:13,
81:18, 82:13,
82:17
damaged
18:18, 19:14,
22:2, 22:4, 22:9
damaging
25:9, 32:18,
81:21
damp
23:5, 23:10
dampness
23:2, 23:4,

30:13, 35:10,
40:9, 64:7
daniel
3:14
data
49:15
database
50:17
date
86:16
day
87:13
days
6:9, 15:7,
46:10, 82:11
deal
62:19
dec
38:9
december
12:8, 12:15
deciding
43:13
decision
40:17, 40:22,
41:10, 41:11,
41:12, 41:20,
43:6, 58:1,
72:19, 73:4,
84:5
decisions
44:4, 57:5,
57:21
declaration
37:14
declarations
25:14, 27:16
deductible
25:16, 26:5
deductibles
26:3, 27:16
defect
33:3, 34:4
defendants
1:14, 3:13
defined
26:7, 26:15,
26:20, 28:17,

68:16
definition
27:19, 27:21,
28:5, 28:16
definitions
27:2, 27:3,
27:5, 27:6
degree
7:18, 64:18
delay
48:7
denial
4:15, 15:22,
16:10, 16:16,
16:21, 17:3,
40:18, 41:10,
41:11, 41:12,
41:20, 72:19,
78:4, 78:22,
79:22, 84:1
denials
17:1
denied
16:6, 59:17
deny
40:17, 80:18
denying
76:17
department
37:20
depend
33:20, 62:9,
62:15
depending
71:18
depends
25:5, 39:16,
43:13, 53:13,
54:14, 56:3,
60:1, 60:2,
64:16
deponent
86:1
deposition
1:16, 2:1,
4:10, 5:17, 6:3,
6:14, 6:16,
17:12, 87:3

derivative
47:11
describe
63:19, 72:1
designate
49:12
designated
49:8
designee
5:22
despite
40:7
determine
43:4, 53:3
determining
11:14
development
63:8, 66:9
developments
64:2, 64:14
difference
13:12, 13:16,
13:19, 14:19,
23:21, 24:5,
24:8, 81:12,
82:2
different
12:1, 13:20,
13:21, 14:3,
14:16, 38:13,
51:4, 51:8,
62:12, 63:22,
64:1, 64:4,
64:16, 70:7,
75:15, 81:11
differently
47:16
direct
20:22, 68:13,
68:21, 80:10
directly
29:22, 48:18,
58:18, 73:11
directs
52:10
discovered
80:14
discuss
10:21

Transcript of Richard Ketaily
Conducted on May 27, 2021

95

discussed
76:20
discusses
51:8, 68:8
discussion
6:21, 37:6
discussions
6:22, 7:1,
60:19
distinction
24:10
district
1:1, 1:2
division
45:4
document
5:19, 17:18
documents
6:20, 7:2,
7:12, 37:8
doing
50:6, 57:11,
62:5, 62:20
done
32:15, 61:3,
63:2
down
19:6, 30:11,
53:10
draft
4:11, 15:21,
17:4, 17:5,
17:13, 17:14,
76:10
drafted
17:7, 77:14
drafting
16:19, 77:9,
78:3
dry
67:22, 68:9
dryness
30:13, 35:10,
40:8, 64:8
drywall
32:18, 81:21
due
23:10

duly
5:8
duplicate
51:3
during
9:8, 13:1,
49:13, 74:8,
83:10
dwelling
27:12

**E**

each
13:20, 25:16,
71:21, 72:10,
76:6, 76:12
earlier
81:17
ears
56:2
east
1:4, 5:13
education
7:20
educational
7:14
efficient
31:16, 31:21
either
14:9, 26:9,
34:8, 36:17,
58:19, 72:3,
76:9, 76:19
elements
68:20
elevate
40:20, 54:1
elevated
79:7
elevation
11:15
else
15:8, 41:13,
70:19, 79:16
email
85:12
emails
72:22

employed
66:6, 87:9
employee
73:21, 74:12,
74:16, 75:3
employers
75:11
employment
13:9, 45:22,
74:18, 74:22
enclosed
86:7
end
39:7, 43:15,
44:2
ended
51:4
endorsement
55:8
endorsements
13:4, 37:7,
38:10, 38:15,
38:21, 47:12
ends
40:22
endurance
1:12, 4:12,
8:21, 9:22,
11:3, 13:10,
19:5, 37:12,
55:14
endurance's
42:16
engineers
23:15, 23:16
enough
53:22
ensuing
20:3, 32:15,
33:14, 34:4,
34:22
enter
50:15
entering
40:1
entire
80:21
equipment
13:4

erik
3:4, 5:13,
45:6, 47:20,
60:4, 63:3,
66:17, 80:3
errata
86:7
escalated
15:8, 16:8
esquire
3:4, 3:14
est
1:19
etcetera
14:14, 47:2,
61:1
even
59:17
event
30:3, 49:8,
51:5
events
46:16, 49:3,
49:6
ever
6:3, 9:3,
50:20, 54:16,
58:18, 64:6,
66:4
every
15:6, 53:1,
56:16, 56:17,
56:20
everyone
85:18
everything
60:17
exact
70:3
examination
4:3, 5:7, 5:10
examined
5:8, 86:3
example
14:6, 32:18,
37:17, 49:16,
50:19
except
27:22, 65:8,

Transcript of Richard Ketaily
Conducted on May 27, 2021

96

| | | | |
|---|---|---|---|
| 65:22 | expand | fairfax | financial |
| **exception** | 25:2 | 3:8 | 87:10 |
| 57:2 | **expect** | **fairly** | **find** |
| **exclude** | 34:14, 34:20, | 44:21 | 26:11, 32:20 |
| 14:13, 22:19, | 60:16 | **familiar** | **fine** |
| 32:6, 46:15 | **expenses** | 18:13, 29:10, | 8:3, 39:10, |
| **excluded** | 65:9, 72:7, | 29:11, 31:6, | 79:17, 84:11 |
| 19:12, 20:5, | 72:12 | 31:11, 31:15, | **fire** |
| 20:14, 20:17, | **experience** | 46:3, 46:13, | 1:9, 8:5, 8:11 |
| 21:1, 29:2, | 7:21, 12:17, | 47:4 | **fired** |
| 29:16, 32:16, | 12:21, 62:4, | **far** | 9:3 |
| 34:16, 35:1, | 62:5, 62:15, | 58:4, 71:11, | **fireman's** |
| 53:4 | 69:19 | 83:8 | 8:14, 13:6, |
| **exclusion** | **experts** | **farm** | 13:8 |
| 18:14, 18:16, | 7:10, 72:11 | 8:5, 75:12 | **first** |
| 19:7, 29:21, | **expires** | **feel** | 5:8, 10:9, |
| 30:14, 31:20, | 87:15 | 86:6 | 10:11, 79:22, |
| 32:3, 34:17, | **explain** | **fell** | 85:14 |
| 46:12, 52:2, | 34:13, 76:10 | 39:20 | **five** |
| 52:19, 64:8 | **explaining** | **few** | 60:6, 79:15 |
| **exclusions** | 76:6, 76:14 | 82:21 | **fix** |
| 19:7, 28:19, | **exposure** | **field** | 33:3, 33:11 |
| 28:22, 29:8, | 43:4 | 8:14, 56:8, | **flip** |
| 30:9, 34:1, | **extension** | 56:14, 57:11, | 14:11, 51:18 |
| 39:4, 46:4, | 68:12 | 60:19, 61:19, | **flood** |
| 48:3, 51:8, | **extensions** | 70:19 | 25:8, 25:15, |
| 52:9, 62:21, | 39:3, 39:7, | **file** | 26:1, 26:4, |
| 82:18 | 68:7 | 6:21, 7:5, | 27:7, 27:9, |
| **executives** | **extent** | 11:2, 11:12, | 27:14, 27:19, |
| 63:10, 63:13 | 82:2 | 15:3, 15:6, | 28:1, 28:10, |
| **exhibit** | **extreme** | 15:14, 23:17, | 28:17, 82:9, |
| 4:10, 4:11, | 40:9, 53:14 | 23:20, 38:17, | 82:13, 82:17 |
| 4:12, 4:13, | **eyes** | 40:19, 40:21, | **floor** |
| 4:14, 4:15, | 56:2 | 52:16, 53:7, | 3:17 |
| 17:11, 17:12, | | 53:14, 53:20, | **florida** |
| 17:13, 19:4, | **F** | 54:14, 58:10, | 64:4 |
| 37:11, 37:12, | **fact** | 58:17, 60:1, | **follow** |
| 55:6, 67:17, | 18:3, 21:15, | 61:7, 61:12, | 72:4 |
| 77:8, 78:1, | 40:7, 71:3 | 61:14, 61:18, | **follow-up** |
| 78:21, 79:22, | **factors** | 62:16, 70:11, | 82:21 |
| 80:2, 80:5, | 60:2 | 70:12, 70:14, | **following** |
| 80:6, 80:9 | **facts** | 73:16, 74:1, | 29:22, 71:15, |
| **exhibits** | 27:19, 50:14, | 77:3, 78:14 | 71:17, 71:18, |
| 5:2, 85:1 | 58:12 | **files** | 72:4 |
| **existence** | **failing** | 11:13, 12:4, | **follows** |
| 19:14 | 34:15 | 15:6, 23:19, | 5:9 |
| **existing** | **failure** | 74:9, 77:1 | **foregoing** |
| 14:10, 14:17 | 18:7 | **final** | 87:3, 87:4 |
| | | 10:21 | |

Transcript of Richard Ketaily
Conducted on May 27, 2021

97

**foreign**
37:20
**forensic**
62:1
**form**
14:8, 14:12,
16:2, 16:13,
18:20, 22:6,
22:21, 24:22,
26:14, 28:6,
29:1, 37:10,
37:18, 38:2,
38:4, 38:13,
46:6, 46:14,
46:17, 46:20,
47:9, 47:10,
47:11, 59:10,
71:9, 72:3,
72:5, 82:5
**formal**
62:17
**forms**
14:1, 14:7,
14:20, 32:12,
37:13, 38:10,
38:13, 43:20,
47:4, 47:12,
73:7
**formulate**
59:22
**forward**
15:1
**found**
33:21, 35:18
**foundation**
60:13
**frame**
49:13, 75:4
**front**
29:3, 29:16
**full-time**
74:12
**fully**
21:4
**fund**
8:14, 13:6,
13:8
**fungus**
67:22, 68:9,

68:15, 68:16,
68:21, 69:14
**furnished**
7:9
**further**
23:18, 25:1,
82:19, 84:21,
84:22

**G**

**gas**
82:1
**gathered**
60:18
**gathering**
57:22
**gave**
15:20
**general**
15:10, 59:2,
71:13, 82:11,
83:8
**geographical**
49:14
**georgia**
8:9, 8:12,
8:15, 8:19,
10:5, 10:7
**gervasio**
58:7
**getting**
65:5, 85:10
**give**
21:2, 32:3,
41:4, 43:12
**given**
15:19, 64:12,
64:15, 64:18,
86:5, 87:5
**glue**
32:5, 34:11,
34:15
**glued**
32:22
**go**
6:11, 8:1,
9:13, 10:18,
15:13, 19:6,

21:5, 27:5,
29:10, 32:7,
32:14, 34:21,
48:16, 48:20,
48:21, 50:19,
56:10, 57:1,
57:6, 61:6,
61:12, 63:14,
75:18, 76:11,
78:11, 78:17,
84:11
**goes**
76:18
**going**
5:15, 6:11,
15:1, 17:9,
17:10, 18:21,
18:22, 19:6,
25:3, 32:19,
32:22, 33:1,
41:2, 55:5,
62:20, 67:18,
77:4, 78:20,
79:21, 81:22,
85:9
**good**
5:12, 18:14,
19:8, 19:11,
32:3, 34:17,
84:16
**goodman**
78:3
**governs**
44:4
**greengrass**
3:15
**grew**
11:10
**ground**
56:2
**group**
8:22, 10:14
**groups**
65:14
**grow**
69:15
**grown**
12:1

**gs**
83:4, 83:6
**guess**
14:5, 25:1,
34:20, 38:14,
38:20, 43:5,
45:3, 49:3,
50:13, 50:21,
51:15, 51:18,
60:16
**guidelines**
43:14, 51:7
**guys**
60:7

**H**

**hand**
54:15, 87:12
**handle**
11:9, 12:4,
13:5, 50:4,
56:20
**handled**
13:2, 13:10,
58:17, 69:21,
74:8
**handling**
53:7, 64:1,
74:6, 78:14
**handouts**
64:15
**hang**
64:19
**happen**
12:5, 34:14,
42:5, 75:21
**happy**
45:14
**head**
48:4
**heads**
42:8
**hear**
22:22, 61:16
**heard**
7:16, 31:21
**heavy**
24:13

help
19:1, 49:21
helps
49:22
here
5:22, 15:12,
25:14, 26:6,
27:7, 30:11,
38:18, 80:11,
81:2
hereby
86:3, 87:3
hereunto
87:12
hierarchy
44:3
highest
7:20
holloman
42:10, 42:15,
43:16
holloman's
42:11
home
44:15, 44:22,
45:1
homes
44:17, 44:18
hour
60:4
humid
36:16, 36:22,
37:1
humidity
35:4, 36:15,
46:15
hundred
54:21, 70:4
hundreds
70:1
hurricane
64:2
hypothetical
32:4, 34:10,
76:2

**I**

identification
5:3

identified
37:13, 70:9
identifier
50:1
identify
7:2
imu
19:5
include
7:7, 18:7,
27:10
included
11:12, 38:11,
62:10
includes
7:5, 65:7
incorporated
55:21
independent
7:6, 7:8,
54:20, 56:11,
56:13, 57:6,
57:11, 57:16,
57:20, 60:19,
72:15, 76:13,
77:3
indirectly
29:22
industry
29:6, 47:14,
47:18, 49:11
inform
80:12
information
45:8, 45:10,
48:11, 48:17,
48:22, 51:12,
57:12, 58:1,
58:12, 60:18,
61:8, 61:19,
64:21, 83:17
initial
15:15, 83:11,
85:14
initially
5:16, 9:7,
32:20, 72:20
inland
9:1, 11:4,

11:8, 12:10,
12:12, 12:16,
12:17, 12:21,
13:3, 13:5,
13:11, 13:13,
13:18, 14:3,
14:7
input
17:7, 42:1,
42:6, 43:12,
52:22, 54:2,
58:4, 62:16,
79:10
inquiry
6:15, 6:19
inside
22:15, 23:10
inspections
56:11
installation
13:4
installed
32:4
instruct
60:11, 80:17
instructed
80:12
instructs
60:15
insulation
21:11
insurance
1:9, 1:12,
4:12, 7:21, 8:8,
8:15, 8:20,
9:20, 19:5,
29:6, 30:19,
31:6, 50:13,
64:14, 67:21,
71:3
insurances
57:17
insured
7:11, 50:20,
51:3, 57:18,
60:2, 60:20,
61:8, 61:20,
68:14, 68:15,

70:18, 76:5,
78:2, 83:9,
83:16
insured's
19:13, 83:13
insureds
61:5, 83:1
insurers
80:12, 80:17
insuring
14:1
intended
14:16
interacted
10:17
interaction
10:9, 10:12
interest
87:10
interior
18:4, 18:12,
39:22
internal
4:11, 17:4,
17:5, 17:13,
51:7, 51:16
international
6:1, 7:19
interpret
83:22
interpretation
51:7
intertwined
47:2
investigate
57:6
investigation
23:18
involve
55:3, 69:20,
69:22
involved
51:21, 55:2,
57:20, 57:22,
61:21, 62:16,
77:9, 77:11,
77:15, 83:4,
83:7, 84:4,

Transcript of Richard Ketaily
Conducted on May 27, 2021

84:14
**involvement**
61:11, 74:1,
74:4, 76:22
**iso**
47:4, 47:5,
47:9, 47:10,
47:17, 47:19,
48:2, 48:3,
48:10, 48:15,
49:5, 49:7,
50:7, 50:11,
50:12, 50:16
**iso's**
48:20
**issuance**
37:15, 38:11,
38:16
**issue**
39:2, 41:4,
84:12
**issued**
38:10, 38:15,
38:18, 38:21,
79:5
**it'll**
72:1, 72:2,
72:3, 72:4
**items**
22:9, 22:12,
46:20, 64:18
**itself**
10:12, 18:19,
19:20, 22:18,
36:1, 37:10,
72:3, 80:20

**J**

**january**
12:6, 87:15
**jason**
42:10, 42:11,
42:15, 43:16
**jeff**
58:7
**job**
1:20, 11:9
**jobs**
9:4

**joined**
8:21, 9:22,
11:6
**joints**
32:8, 33:9,
34:11, 34:15,
34:21
**jones**
3:6
**july**
4:14, 78:1,
78:22, 79:2,
80:1
**jumping**
28:20
**june**
87:13

**K**

**keeps**
50:12
**kerry**
10:15, 10:19,
15:3, 15:5,
15:21, 41:9,
44:7, 54:16,
58:17, 58:20,
59:3, 67:3,
70:22, 72:19,
73:1, 73:11,
74:2, 75:6,
76:19, 77:1,
78:16, 84:6
**ketaily**
1:16, 2:1, 4:3,
5:6, 5:12,
60:11, 85:11,
86:13
**kind**
11:15, 28:20,
38:14, 41:3,
45:15, 63:6,
63:7, 63:19,
64:6, 64:7,
65:14
**kinds**
64:11
**know**
6:12, 11:14,

14:15, 17:3,
17:20, 24:15,
25:11, 29:5,
29:20, 31:12,
35:10, 39:5,
41:14, 42:14,
43:4, 44:13,
44:14, 45:1,
45:12, 45:14,
45:17, 47:21,
48:3, 48:17,
50:2, 58:20,
59:11, 59:12,
59:22, 64:19,
66:1, 66:8,
66:20, 69:14,
70:3, 71:12,
74:18, 75:9,
76:5, 76:19,
76:21, 77:11,
80:22, 81:16,
82:8, 82:10,
83:4, 83:16
**known**
8:22, 45:15

**L**

**lack**
18:3, 18:10,
18:18, 19:19,
21:8, 21:16,
21:21, 22:14,
23:11
**lacking**
84:16
**language**
29:3, 29:12,
29:15, 29:18,
30:9, 30:10,
30:17, 30:21,
31:8, 31:14,
38:22, 46:14,
69:4
**large**
12:4, 44:21
**last**
6:9, 6:10,
19:10, 27:9,

36:15, 45:15,
85:15
**late**
44:11
**later**
21:20, 83:10
**latest**
64:2
**law**
64:4, 64:14
**lawson**
3:4, 4:4, 5:11,
5:13, 45:11,
45:20, 60:10,
79:19, 80:4,
80:8, 82:19,
84:22, 85:3,
85:7, 85:17
**layman's**
40:14, 69:18
**lea**
63:14, 65:7,
65:13, 65:22,
66:2, 66:4,
66:10
**leakage**
46:4, 46:10,
46:21
**leaked**
82:10
**learn**
62:3
**least**
48:18, 56:21,
79:8, 79:9
**leave**
44:10
**legal**
52:5
**less**
14:18, 43:12,
50:5, 63:21,
65:19
**let's**
48:17, 60:8,
71:1
**letter**
4:13, 4:14,

Transcript of Richard Ketaily
Conducted on May 27, 2021

100

| | | | |
|---|---|---|---|
| 4:15, 16:19, 17:7, 76:10, 76:14, 77:12, 78:1, 78:4, 78:11, 78:17, 78:22, 79:1, 79:4, 79:22, 80:5, 80:19, 80:21, 81:8, 83:12 | 80:11 | 17:15, 19:1, 23:18, 31:13, 48:16, 49:6, 49:7, 58:9, 61:7, 61:12, 67:14, 72:21 | 87:2 |
| **letter's** 41:2 | **lines** 12:1, 23:3, 32:21, 35:9, 52:19 | **looked** 7:2, 7:4, 7:9, 7:10, 7:12, 16:5 | **M** |
| **letters** 16:6, 76:11, 77:5, 83:16, 83:21, 84:1 | **linkedin** 46:2 | **looking** 28:16, 35:12, 38:3, 38:9, 67:17, 73:7 | **machinery** 64:3 |
| **level** 7:20, 21:18 | **liquid** 24:16, 24:21, 28:5, 28:11, 82:1, 82:4 | **loss** 10:10, 10:12, 11:18, 12:4, 14:22, 18:1, 18:8, 19:13, 20:3, 20:4, 20:22, 21:9, 21:17, 24:1, 27:14, 27:19, 27:22, 28:19, 29:2, 29:16, 29:21, 30:4, 31:19, 34:22, 37:9, 39:16, 40:17, 41:21, 50:4, 50:5, 52:18, 54:17, 55:4, 55:9, 55:19, 56:1, 56:22, 57:7, 57:10, 57:14, 57:15, 58:13, 60:17, 60:22, 61:2, 61:4, 61:19, 63:10, 63:13, 66:14, 68:14, 68:15, 68:21, 69:6, 70:2, 70:17, 76:17, 80:14, 81:6 | **made** 50:17 |
| **liability** 66:15, 66:18, 66:21 | **lirb** 66:20 | | **main** 38:3, 39:3 |
| **library** 51:16, 64:21 | **list** 29:2 | | **make** 39:1, 42:3, 57:4, 67:9, 86:7 |
| **likely** 40:5 | **listed** 38:13, 38:18 | | **makes** 23:21, 24:7, 28:21, 43:6 |
| **likewise** 72:14 | **listing** 50:5 | | **making** 18:14, 19:8, 19:11, 32:3, 34:17, 58:2, 84:16 |
| **limit** 68:18 | **litigation** 59:8, 59:14, 59:16 | | **manage** 11:11 |
| **limitations** 28:18, 34:1, 39:5, 47:1, 82:18 | **little** 7:16 | | **management** 11:15, 12:3, 45:4 |
| **limited** 20:5, 20:14, 20:17, 21:1, 58:11, 58:15, 67:21, 68:8, 74:3, 76:22 | **livingston** 1:22, 2:21, 87:2 | | **manager** 8:14, 8:21, 9:10, 9:21, 15:2, 15:8, 16:7, 40:22, 41:6, 41:10, 79:8 |
| **limits** 27:15 | **llc** 1:6 | | **manmade** 18:6 |
| **linda** 11:1, 15:21, 73:16, 73:19, 76:20, 76:21, 78:10, 78:14 | **llp** 3:15 | **losses** 8:6, 50:13, 50:20, 64:2 | **manuscript** 47:13, 72:3 |
| **line** 27:9, 33:9, | **local** 56:22 | **lynne** 1:22, 2:21, | **many** 6:6, 50:20, 66:12, 69:20 |
| | **location** 50:5, 54:17, 70:2, 80:15, 81:6 | | **marine** 9:2, 11:4, 11:8, 12:10, 12:13, 12:16, 12:17, 12:21, 13:3, 13:6, 13:11, 13:13, 13:18, 14:4, 14:7 |
| | **log** 7:5, 10:19, 50:22 | | |
| | **log-in** 48:21, 49:1, 50:7, 50:9 | | |
| | **long** 27:18, 75:5 | | |
| | **long-lasting** 46:15 | | |
| | **look** 15:9, 15:13, | | |

mark
17:11, 78:21
marked
5:2, 77:8
market
70:12, 70:15,
71:1, 71:2,
73:6, 73:7,
75:14, 77:1,
77:21, 84:2
markets
61:21
marking
19:4
maryland
2:22, 87:24
matches
35:18
material
64:12, 84:17
materials
22:4, 22:18
matter
5:14, 72:8
maxum
8:19, 9:20,
13:9, 75:10
maybe
16:9, 44:11,
44:15, 60:15
mccullough
1:6, 5:14, 70:8
mean
24:12, 24:15,
28:15, 29:8,
34:16, 44:17,
74:12
meaning
32:17
means
26:7, 28:5,
59:4
meant
34:13
measure
23:13, 70:7,
70:16
measurement
61:2, 61:4,

70:17
measurements
70:7
meet
27:19
member
65:12, 66:1
membership
65:6, 65:10,
67:2
memory
18:22
mentions
35:10
merely
19:12, 42:2
met
37:11
methodology
36:9
midwest
49:17
might
25:8, 25:11,
49:18, 52:4,
52:9, 82:8, 82:9
mind
13:12, 19:3,
25:3, 38:6,
60:5, 79:14,
81:13, 81:16
minute
60:6, 79:15
minutes
60:8
missing
30:5
misspeaks
81:9
mm-mm
38:1
model
57:3
moisture
21:18, 22:3,
22:10, 22:14,
22:15, 23:11,
23:12, 23:14,

24:2, 24:10,
24:12, 24:13,
25:2, 35:5,
35:11, 36:10,
69:15, 81:13,
81:21, 84:18
mold
67:10, 67:15,
69:20, 69:22,
70:2
month
75:3
months
73:22, 74:8,
75:2
more
14:18, 32:2,
43:12, 47:13,
50:5, 53:10,
53:16, 56:21,
62:5, 63:21,
65:19, 71:3,
74:6, 79:19,
81:11, 82:1,
82:10, 83:17
morning
5:12
most
52:15, 65:11,
73:8
mound
3:15
moved
12:2, 12:6
much
21:21, 59:14
must
74:2
mutual
8:8, 13:1
myself
11:15, 50:15,
58:17, 58:18,
64:18, 73:1

**N**

name
5:12, 31:7,

31:12, 63:12,
85:15
named
55:1
necessarily
20:3, 28:15,
38:17
necessary
16:8, 54:4,
54:5, 86:7
need
17:17, 20:4,
41:22, 54:13,
74:15, 79:8,
80:20
needed
15:4, 42:5
needs
79:6
neither
54:16, 55:22,
87:8
never
56:10
new
3:16, 3:18,
14:9
next
10:16, 35:17
noble
59:6
nominal
65:7
nominated
54:22, 55:11,
55:12
non-weatherman
40:14
normal
65:5
normally
40:20
notarial
87:13
notary
2:22, 87:1,
87:23
notes
7:6, 10:19,

Transcript of Richard Ketaily
Conducted on May 27, 2021

102

15:14, 79:15
**nothing**
64:20, 67:8
**notice**
2:21, 4:10,
5:16, 6:16,
17:12, 37:21,
42:2, 50:11,
60:18
**notifications**
49:2
**number**
45:18, 46:10,
50:14, 55:8,
69:21, 70:4,
70:5, 74:8, 77:2
**numbers**
38:13

---

**O**

**o'connell**
3:14, 4:5,
13:14, 16:2,
16:13, 16:15,
18:20, 20:1,
20:10, 21:13,
22:6, 22:21,
23:7, 24:3,
24:22, 25:18,
28:6, 28:13,
29:7, 30:22,
31:2, 31:9,
32:9, 33:5,
33:12, 33:18,
34:6, 34:18,
35:6, 35:22,
36:6, 36:12,
36:18, 37:4,
39:13, 40:2,
40:11, 42:13,
42:21, 43:9,
45:9, 45:12,
46:6, 46:17,
47:6, 47:20,
52:12, 53:12,
54:9, 59:10,
59:18, 60:13,
62:7, 65:16,

67:12, 69:11,
69:16, 71:9,
75:16, 76:2,
80:2, 80:6,
80:19, 81:14,
82:5, 82:15,
82:21, 84:20,
85:9
**object**
16:2
**objection**
13:14, 16:13,
18:20, 20:1,
20:10, 21:13,
22:6, 22:21,
23:7, 24:3,
24:22, 25:18,
28:6, 28:13,
29:7, 30:22,
31:9, 32:9,
33:5, 33:12,
33:18, 34:6,
34:18, 35:6,
35:22, 36:6,
36:12, 36:18,
37:4, 39:13,
40:2, 40:11,
42:13, 42:21,
43:9, 46:6,
46:17, 47:6,
47:20, 52:12,
53:12, 54:9,
59:10, 59:18,
60:13, 62:7,
65:16, 67:12,
69:11, 69:16,
71:9, 75:16,
76:2, 80:19,
81:14, 82:5,
82:15
**obtain**
59:8, 70:17
**obtained**
61:8
**obtaining**
58:21
**obvious**
53:9

**occur**
18:12
**occurrence**
51:1, 68:4,
69:7, 69:10
**ofac**
37:17
**offer**
58:7
**offered**
17:6, 42:6,
58:10, 59:6,
77:15
**offering**
58:4
**offhand**
7:13, 31:12,
45:17, 70:11
**office**
10:22, 37:20,
56:5, 56:6,
57:12, 65:6
**officer**
87:2
**often**
59:5, 75:18,
75:20
**oh**
44:17
**okay**
6:11, 8:4, 9:3,
9:6, 11:3, 12:5,
12:8, 13:5,
13:16, 14:21,
16:18, 17:21,
18:6, 21:6,
21:15, 24:19,
34:3, 35:3,
35:15, 35:20,
38:6, 39:18,
40:16, 41:9,
42:9, 44:3,
44:7, 45:5,
45:12, 45:21,
46:3, 47:4,
48:8, 48:20,
49:16, 50:16,
52:1, 53:1,

54:6, 54:11,
55:5, 55:12,
55:22, 56:9,
57:3, 59:16,
60:3, 60:7,
61:3, 63:15,
63:19, 66:8,
67:1, 67:20,
69:8, 70:13,
71:1, 71:20,
72:6, 73:3,
74:18, 75:5,
76:19, 77:4,
77:8, 77:17,
77:22, 78:6,
80:8, 81:8,
81:12, 82:3,
84:4, 84:20,
85:16, 85:17
**old**
45:19
**once**
12:13, 26:21,
56:21, 62:14
**one**
3:16, 6:10,
9:15, 10:21,
11:9, 11:10,
14:17, 14:18,
15:18, 17:11,
21:2, 25:3,
25:4, 25:16,
27:6, 28:20,
32:1, 36:15,
37:5, 38:12,
41:22, 46:21,
53:14, 55:2,
71:3, 71:17,
72:4, 72:5,
73:9, 73:17,
74:9, 75:11,
76:4, 76:12,
76:14, 77:13,
78:9, 78:13,
79:3, 80:1,
83:6, 83:7,
83:15, 84:18
**ones**
65:21

only
10:1, 42:2,
48:13, 51:1,
57:22, 71:20,
74:5, 74:7
opened
33:8
opening
81:19
operate
65:19
opinion
52:5, 54:7,
59:6, 59:8,
59:19, 81:1
opinions
58:5, 58:6,
58:8, 58:10,
58:12, 75:15
opportunity
52:21
opposed
12:21
opposite
76:1
opt
76:13
option
53:19, 54:4
orders
85:5
ordinary
52:3, 52:7,
59:9
organization
63:11
organizations
65:18
other
7:12, 12:6,
27:11, 28:18,
28:20, 30:2,
30:10, 34:1,
37:7, 38:21,
41:12, 51:9,
53:14, 61:21,
62:11, 65:13,
65:18, 65:21,

66:9, 70:15,
72:5, 73:13,
76:17
other's
71:18
others
62:16
otherwise
20:4, 20:14,
32:16, 35:1,
87:11
ourselves
70:16
out
10:22, 12:11,
17:3, 32:17,
32:20, 41:2,
52:11, 56:7,
57:1, 61:22,
73:15, 74:2,
76:11, 77:12,
78:7, 78:11,
78:17, 83:12,
83:16
outcome
87:11
outside
52:20, 54:13
over
9:18, 21:7,
62:20, 70:3,
75:2, 75:7
overall
57:10, 77:2
own
12:4, 43:15,
47:12, 65:9,
70:6, 70:21

---

**P**

p-o-u-l-t-i
44:15
p-u-l-t-e
44:17
page
4:3, 4:9,
17:10, 25:14,
26:13, 27:6,

27:17, 29:1,
37:14, 37:19,
38:9, 38:12,
42:4, 55:8
pages
1:21
paid
69:8
panel
67:7
paragraph
19:10, 30:16,
68:8
parham
11:1, 73:16
part
8:22, 12:4,
16:22, 27:2,
27:5, 37:21,
38:16, 46:4,
52:3, 52:7,
53:1, 53:7,
59:9, 67:6,
68:7, 73:8,
74:22
partially
18:9
participate
15:22, 16:10,
43:7, 72:5, 78:3
participated
16:18, 40:16,
41:9, 41:11,
72:18
participating
73:6
participation
72:2, 76:6
particular
10:17, 29:15,
52:2, 73:12
parties
87:9
parts
32:21
party
8:18, 9:8,
9:18, 51:11,

62:18
password
48:21, 49:1
past
51:1, 62:22
pay
64:22, 65:1,
65:4, 68:13,
68:18, 69:2
payment
72:14
pcs
49:2
penetration
39:20
people
23:22, 62:5
percent
54:22, 71:22,
72:10
peril
20:16, 20:22,
21:1, 28:1,
28:19, 34:5,
49:12, 60:22,
61:1
perils
20:14, 28:12,
49:12
period
9:9
person
41:12, 54:2,
56:10, 57:7,
63:7
personally
64:18
phone
21:3, 45:18,
45:19, 45:21,
46:1, 58:14,
58:21, 59:4
phrase
29:11, 31:15,
31:18, 42:18,
52:14, 56:3
phrased
8:9

Transcript of Richard Ketaily
Conducted on May 27, 2021

104

**phrases**
26:15
**phrasing**
81:2
**physical**
20:22, 25:9,
68:13, 68:21,
81:18
**pipe**
24:16, 25:7,
32:18, 81:20
**place**
85:12
**plaintiff**
1:7
**plaintiffs**
3:3
**play**
83:9
**plaza**
3:16
**please**
19:3, 31:5,
34:8, 34:9,
37:5, 80:21,
85:12
**plrb**
66:13, 66:20,
67:2
**plumbing**
32:5, 34:11
**plus**
74:22
**point**
10:22, 11:9,
15:18, 15:19,
21:16, 26:2,
40:14, 48:6,
73:15, 73:17,
77:13, 80:10,
83:15
**pointing**
71:16
**policies**
13:4, 13:17,
13:19, 14:16,
26:21, 26:22,
39:6, 46:14,

48:11, 54:22,
55:1, 67:14,
67:15, 71:21
**policy**
4:12, 7:10,
13:13, 18:13,
18:21, 19:1,
19:5, 19:12,
19:19, 20:5,
20:6, 20:9,
20:12, 20:13,
20:15, 20:17,
20:21, 22:19,
23:22, 25:7,
25:15, 25:22,
26:8, 26:16,
26:20, 27:1,
27:15, 28:18,
29:17, 30:5,
31:13, 32:6,
32:11, 32:13,
32:14, 33:2,
35:4, 35:8,
35:12, 35:21,
36:1, 36:4,
36:11, 36:16,
37:6, 37:12,
37:18, 37:21,
38:3, 38:8,
38:11, 38:16,
38:18, 38:19,
38:22, 39:3,
39:11, 39:15,
39:21, 40:6,
42:17, 43:20,
46:5, 51:6,
51:9, 51:14,
52:9, 53:4,
54:12, 54:19,
55:4, 55:5,
55:14, 55:15,
60:20, 67:10,
67:18, 69:7,
71:16, 71:17,
71:18, 71:22,
72:1, 72:2,
76:7, 80:7,
80:13, 80:16,

81:4, 82:4,
82:8, 82:13,
82:16, 83:22
**policyholder**
37:21
**posed**
54:12
**position**
21:6, 21:8,
24:19, 84:2
**positions**
76:11, 76:14
**possibility**
82:12
**possible**
75:14, 75:17
**possibly**
62:1, 62:12,
76:22, 84:19
**potential**
52:17, 60:22
**practice**
52:4
**practices**
52:8, 59:9
**pre-covid**
57:1, 63:16,
63:20
**prefer**
8:1
**premium**
43:4
**prepare**
6:18
**presence**
22:3, 24:13,
25:10
**present**
70:2
**presented**
15:5, 67:7
**presenters**
64:17
**president**
9:1, 11:4,
11:8, 12:9,
12:12, 12:13,
12:15

**pretty**
29:9, 49:3
**previous**
75:11
**principals**
83:7
**prior**
12:18, 13:9,
75:11
**privileged**
59:7
**probably**
14:5, 66:22,
81:2
**process**
15:10, 53:2
**produced**
16:22
**professional**
63:8, 66:9
**program**
62:17
**project**
18:5, 19:21,
27:15, 39:7,
43:8, 43:17,
68:14, 68:15,
73:12, 83:8
**promotion**
12:14
**pronouncing**
44:19
**properly**
32:15
**property**
8:6, 8:13,
8:20, 9:1, 9:9,
9:21, 11:8,
12:2, 12:12,
12:16, 12:22,
13:2, 13:10,
13:13, 13:18,
14:3, 14:12,
14:13, 19:13,
46:5, 46:8,
46:20, 51:4,
52:18, 60:21,
61:1, 66:14,

Transcript of Richard Ketaily
Conducted on May 27, 2021

105

66:15, 66:18,
68:14, 69:19
**proportionate**
76:16
**proposed**
15:18
**provide**
41:1, 45:14,
65:20
**provided**
58:16, 70:8,
83:17
**provides**
46:9, 48:3,
48:10, 49:5,
50:16
**providing**
57:11
**provision**
26:11
**provisions**
51:9, 83:22
**proximate**
31:16, 31:22
**public**
2:22, 83:2,
83:13, 83:16,
83:20, 87:1,
87:23
**publicly**
48:22
**pull**
15:13, 55:5
**pulte**
44:15, 44:18
**purpose**
19:11
**purposes**
59:8
**pursuant**
2:21
**put**
17:14, 50:1,
74:17

**Q**

**quantum**
57:15

**question**
10:20, 15:4,
15:16, 17:20,
19:2, 19:18,
31:4, 34:9,
36:2, 36:3,
37:5, 38:5,
38:22, 39:9,
44:1, 48:8,
48:9, 51:13,
51:19, 52:6,
52:8, 52:17,
53:20, 54:11,
54:15, 56:19,
58:3, 59:13,
59:21, 61:1,
74:10, 84:8
**questions**
6:19, 11:13,
57:14, 79:3,
79:20, 82:20,
82:22, 84:21
**quick**
20:20, 31:5,
55:3, 60:5,
61:7, 61:12
**quite**
59:4, 65:7

**R**

**rain**
39:20, 40:1,
81:20
**raised**
84:13
**ratio**
72:13
**re-ask**
48:8
**re-inspector**
8:6
**reach**
55:3, 61:22,
75:15
**reached**
75:21, 76:1
**read**
17:19, 27:3,

47:22, 79:2,
85:13, 86:3
**reading**
64:12, 85:8
**real**
20:20, 31:4,
61:7, 61:12
**realistically**
23:4
**really**
44:1, 53:9,
57:2, 59:22
**reason**
30:4, 55:22
**reasoning**
50:22
**recall**
7:13, 15:15,
15:17, 18:2,
42:7, 58:9,
58:18, 64:10,
70:11, 73:13,
73:16, 77:12,
78:5, 83:1,
83:11, 83:20,
84:6, 84:12,
84:15
**receive**
47:18, 48:17
**received**
83:13
**recently**
6:8
**recollection**
17:6, 21:15,
22:13, 23:6,
23:9, 37:7,
59:12, 59:15,
68:22, 74:20
**recommended**
84:8
**record**
50:12, 60:9,
79:18, 85:19,
86:5, 87:5
**records**
86:6
**reduced**
87:7

**refer**
23:15, 27:2,
29:8, 29:9,
31:19, 32:11,
35:21, 52:10,
56:13, 70:17,
77:20
**references**
46:9
**referred**
24:1, 31:21
**referring**
46:11, 46:13,
69:3, 71:2
**refers**
55:9
**regard**
14:17, 16:16,
23:19, 62:17
**regarded**
19:13
**regarding**
10:20, 15:21,
42:16, 52:17,
58:12, 61:10,
84:8
**regardless**
30:1, 30:2
**regards**
59:13
**reglue**
32:7, 32:14,
34:21
**reimburse**
67:9
**reinsurance**
50:2
**related**
49:6, 72:7,
80:13, 80:18,
81:5, 87:9
**relationship**
47:17, 48:2,
48:10
**relay**
53:22
**relied**
56:1

Transcript of Richard Ketaily
Conducted on May 27, 2021

106

**rely**
56:11
**remain**
56:6
**remotely**
2:2
**remove**
43:20
**renovations**
14:10
**repeat**
20:20, 31:4,
34:8, 45:7,
47:21, 48:1,
63:4
**repeated**
46:10, 46:21
**rephrase**
34:8, 43:11
**report**
23:19
**reported**
1:22
**reporter**
17:16, 85:1,
85:4, 85:11,
85:16, 85:18,
87:1
**reports**
7:6, 7:9,
23:16, 58:15,
58:22
**represent**
5:13
**represented**
83:2
**representing**
83:8
**request**
23:17
**required**
52:20, 75:1
**requirement**
54:3
**research**
66:14
**reservation**
4:13, 15:17,

16:19, 41:3,
77:5, 77:10,
77:13, 77:17,
80:4, 83:12,
84:1
**resource**
51:17, 66:16,
66:19
**respect**
14:22, 15:11,
42:12
**respective**
76:10
**respond**
80:13, 81:5
**responded**
83:19
**response**
52:14, 78:22,
79:1, 83:13,
83:18, 83:21,
84:2
**responses**
7:4
**responsibility**
11:11, 57:13
**responsible**
76:16
**result**
25:11, 51:2,
69:5
**resulted**
18:4
**resulting**
28:1
**retain**
52:4, 53:15,
54:6, 84:5,
84:11
**retained**
23:16, 72:12
**retired**
74:14, 75:1
**return**
37:1
**returned**
45:21
**review**
6:14, 15:6,

15:20, 23:20,
31:12, 35:8,
40:21, 51:21,
53:8, 60:17,
60:20, 61:4,
61:18, 61:20,
61:22, 77:15,
78:6, 79:15,
80:21, 85:9
**reviewed**
6:20, 16:16,
41:12, 41:14,
79:4, 79:6,
79:9, 83:18
**reviewing**
11:13, 40:19
**reviews**
11:13, 62:12,
64:3
**richard**
1:16, 2:1, 5:6,
86:13
**rick**
45:13, 59:11
**right**
20:6, 20:16,
21:5, 25:17,
26:6, 27:1,
30:2, 32:2,
32:19, 34:12,
35:15, 37:17,
42:3, 44:22,
45:1, 53:5,
60:16, 72:18,
75:20, 79:14,
79:19, 79:21,
80:8, 82:14,
82:19
**rights**
4:13, 15:18,
16:19, 41:3,
77:5, 77:10,
77:13, 77:18,
80:5, 83:12,
84:1
**risk**
13:3, 14:8,
26:14, 32:12,

39:6, 42:12,
43:3, 43:13,
43:14, 45:4,
57:18, 61:9,
71:4, 71:8
**risks**
13:22, 14:3,
14:17
**rketaily@sompo-i-
ntl**
85:15
**road**
6:12
**role**
11:3, 11:7,
11:16, 11:17,
11:20, 12:3,
12:6, 14:21,
15:2, 31:7,
42:11
**roof**
18:7, 21:12,
27:11, 39:19,
39:22, 40:1,
81:20
**rot**
67:22, 68:9
**rules**
6:12

**S**

**said**
9:6, 9:7, 9:8,
13:16, 24:6,
45:6, 56:17,
81:4, 87:5
**salary**
67:4
**same**
9:9, 13:21,
17:10, 33:5,
33:15, 36:6,
36:9, 36:12,
36:18, 42:4,
48:5, 51:3,
51:5, 65:19,
66:22, 71:8,
71:17, 72:13,

73:7, 79:3, 86:4
**saw**
58:13
**say**
6:7, 21:18,
27:18, 36:2,
43:2, 43:5,
43:7, 43:11,
44:11, 45:3,
48:17, 49:4,
49:22, 50:13,
50:19, 53:18,
53:21, 54:3,
56:21, 57:8,
57:9, 60:15,
62:9, 63:12,
69:21, 70:1,
70:22, 74:11,
81:22, 84:11
**saying**
25:21, 26:19,
42:4, 43:16,
51:15, 56:9
**says**
19:11, 20:13,
26:12, 26:14,
27:1, 27:4,
27:9, 29:20,
54:12, 68:12,
71:21, 80:11
**scenario**
35:2, 40:5,
84:9
**schedules**
61:10
**science**
7:17
**screen**
5:15, 35:14
**scroll**
17:18, 67:18
**scrolling**
25:13
**se**
24:14
**seal**
87:13
**search**
36:8, 36:14,

36:21, 36:22,
37:18
**second**
9:16, 20:19,
21:2
**section**
19:6, 26:2,
27:2, 29:17,
46:9, 69:3, 69:5
**sedgwick**
17:1, 55:18,
55:21, 56:2,
56:8, 58:16,
72:14, 77:7,
77:12, 78:2,
80:12, 80:17
**see**
5:17, 19:7,
19:10, 19:15,
23:19, 26:11,
26:16, 27:7,
27:12, 28:2,
28:3, 29:2,
30:10, 31:13,
34:1, 35:17,
37:19, 38:12,
41:19, 49:6,
49:7, 51:6,
55:4, 55:10,
61:12, 61:13,
61:17, 61:18,
67:22, 68:2,
68:5, 68:16,
72:22, 77:5,
79:16, 80:1
**seek**
52:20
**seen**
5:19, 21:20,
51:2
**seepage**
46:4, 46:22
**send**
41:14, 85:13
**senior**
12:3
**sense**
28:21, 39:1,

67:9
**sent**
6:15, 17:3,
41:14, 50:11,
79:11, 83:12
**separate**
37:8, 38:2,
44:3, 44:5,
46:20, 47:3,
49:18, 57:5
**separately**
76:12
**september**
44:11, 44:12
**sequence**
30:4, 30:6
**series**
66:11
**service**
49:5, 50:16
**sessions**
62:12, 63:22,
64:16, 67:5
**set**
50:10, 51:3,
87:12
**severe**
39:18
**shaking**
48:4
**shall**
19:13
**share**
5:15, 42:17,
42:18, 72:10,
76:16, 76:17
**sharing**
72:12
**sheet**
86:7
**short**
74:3, 78:15
**shorthand**
87:1
**shortly**
10:19
**should**
17:7, 31:1,

55:16, 72:17,
73:8, 79:8,
81:4, 84:14
**show**
5:16, 17:9,
18:21, 77:4,
78:20, 79:21
**shown**
27:16
**shows**
68:11
**side**
14:11, 43:3,
48:19, 51:18,
66:21
**sign**
84:10, 85:10,
85:13
**signature-zrhbi**
87:18
**signing**
85:8
**silver**
3:5
**similar**
66:9
**similarly**
67:1
**simply**
19:21
**since**
6:12, 10:4,
11:16, 11:20,
63:1, 63:5,
63:17, 72:9
**sites**
56:6
**situation**
18:11, 57:2,
69:14
**six**
73:22, 74:8,
75:3
**slightly**
43:11
**slowly**
17:18
**soaked**
33:10

Transcript of Richard Ketaily
Conducted on May 27, 2021

108

| | | | |
|---|---|---|---|
| **solely** | 67:1, 67:3, | **speaks** | 26:4, 75:12, |
| 19:14 | 67:6, 68:18, | 36:1, 80:20 | 87:24 |
| **some** | 69:2, 69:8, | **specialist** | **stated** |
| 7:7, 13:20, | 70:6, 70:13, | 8:7, 8:12, 62:1 | 19:15 |
| 26:21, 26:22, | 71:7, 72:6, | **specialize** | **states** |
| 30:4, 32:5, | 73:19, 74:7, | 12:1, 12:2 | 1:1, 49:14, |
| 33:15, 41:3, | 75:6, 75:7, | **specialty** | 69:4, 69:5, |
| 46:14, 48:9, | 76:1, 77:14, | 8:20, 9:20, | 82:16 |
| 50:17, 54:22, | 77:18, 78:12, | 75:11 | **status** |
| 55:1, 63:9, | 78:18, 79:4 | **specific** | 77:3 |
| 67:15, 68:20, | **sompo's** | 14:2, 16:21, | **steam** |
| 69:1 | 17:22, 21:6, | 17:19, 26:4, | 33:16, 33:21 |
| **somebody** | 21:8, 52:7, | 36:3, 47:12, | **stenographically** |
| 50:18, 70:19 | 57:21, 62:3, | 48:3, 49:8, | 87:6 |
| **someone** | 79:11, 79:12 | 49:12, 62:11, | **step** |
| 33:7, 33:8, | **soon** | 62:20 | 15:9 |
| 43:3 | 10:22 | **specifically** | **still** |
| **something** | **sorry** | 14:13, 15:15, | 10:7, 20:4, |
| 25:9, 34:14, | 8:16, 8:17, | 26:19, 48:14, | 32:16, 35:12, |
| 50:15, 81:21, | 9:13, 13:16, | 49:2, 59:2, | 44:7, 65:5, |
| 82:3, 82:7 | 16:14, 20:19, | 64:9, 65:4, | 67:3, 67:4 |
| **sometimes** | 21:2, 21:15, | 78:5, 81:7, | **storm** |
| 47:3, 53:9, | 23:12, 29:10, | 84:15 | 49:16 |
| 53:10, 53:19, | 31:3, 31:4, | **spell** | **storms** |
| 61:22, 76:11, | 42:17, 45:6, | 44:14, 44:19 | 40:8 |
| 76:12 | 47:8, 48:5, | **split** | **street** |
| **sompo** | 60:4, 61:15, | 72:7, 72:15 | 3:6 |
| 5:22, 7:8, | 63:3, 66:17, | **spoke** | **strike** |
| 8:22, 11:4, | 70:13, 71:16, | 58:18 | 39:19, 39:21, |
| 11:18, 16:21, | 74:10, 75:18 | **staff** | 40:1 |
| 17:2, 17:3, | **sort** | 57:13 | **structure** |
| 17:14, 23:13, | 33:16, 46:13, | **stance** | 27:12 |
| 31:18, 32:6, | 48:9, 50:17, | 10:20, 10:21 | **subject** |
| 32:11, 40:16, | 51:12 | **standard** | 82:17 |
| 41:6, 42:20, | **sounds** | 30:20, 32:12, | **sublimit** |
| 43:7, 44:4, | 6:12 | 47:11, 47:14, | 67:16, 67:21 |
| 44:8, 44:10, | **source** | 49:3 | **submitted** |
| 47:15, 47:17, | 27:11, 51:11, | **stands** | 10:13, 50:10, |
| 48:2, 48:9, | 81:19 | 66:13 | 61:4, 61:19, |
| 48:12, 50:18, | **speak** | **start** | 70:18 |
| 51:7, 51:12, | 37:9, 38:22, | 21:7 | **subscribe** |
| 52:10, 52:15, | 48:13, 54:21, | **started** | 47:15 |
| 56:9, 57:3, | 58:14, 59:3, | 12:11 | **subsequently** |
| 59:7, 59:16, | 63:22, 73:10 | **starting** | 38:21 |
| 60:11, 61:3, | **speaking** | 7:15, 14:22 | **substantiate** |
| 62:14, 63:1, | 23:4, 46:19, | **starts** | 57:15 |
| 63:5, 64:22, | 51:20, 66:21, | 48:6 | **suffices** |
| 65:10, 66:6, | 73:13 | **state** | 20:16 |
| | | 2:22, 8:4, | |

Transcript of Richard Ketaily
Conducted on May 27, 2021

109

| | | | |
|---|---|---|---|
| **suite**<br>3:7<br>**summarized**<br>64:13<br>**supervision**<br>87:8<br>**supplement**<br>68:3<br>**supply**<br>32:21, 33:9,<br>34:15<br>**supposed**<br>16:6<br>**sure**<br>14:5, 19:4,<br>20:21, 34:10,<br>38:7, 42:3,<br>44:1, 48:1,<br>55:7, 59:1,<br>63:13, 66:12,<br>67:19, 70:4,<br>78:14, 85:14<br>**surface**<br>24:17, 27:11<br>**sustained**<br>68:21<br>**sworn**<br>5:8<br>**symposium**<br>63:6<br>**symposiums**<br>62:19<br>**system**<br>21:12, 33:16,<br>34:15 | **talking**<br>24:1, 33:8,<br>37:10, 58:20<br>**team**<br>8:14, 11:10,<br>11:11, 12:4,<br>15:2<br>**technical**<br>12:3<br>**telling**<br>7:1<br>**temperature**<br>40:10<br>**temporary**<br>74:15<br>**ten**<br>60:8, 74:22<br>**tenure**<br>66:12<br>**term**<br>23:3, 26:6,<br>26:7, 40:14,<br>81:1, 81:3<br>**termed**<br>81:10<br>**terminated**<br>45:22<br>**terminology**<br>49:12<br>**terms**<br>32:1, 51:16,<br>68:16<br>**terrible**<br>52:6<br>**testified**<br>5:8<br>**testify**<br>5:22<br>**testimony**<br>86:5, 87:5,<br>87:6<br>**th**<br>3:17, 78:1,<br>79:2, 80:1<br>**thank**<br>31:11, 54:11,<br>85:16, 85:17<br>**thanks**<br>85:18 | **themselves**<br>47:13, 76:9<br>**thereafter**<br>10:19, 87:7<br>**they'd**<br>61:22<br>**thing**<br>17:19, 66:22<br>**things**<br>6:13, 15:11,<br>25:17, 47:19<br>**think**<br>6:9, 14:16,<br>22:2, 22:4,<br>22:8, 23:21,<br>24:5, 24:7,<br>25:20, 32:12,<br>36:15, 39:2,<br>44:15, 44:19,<br>49:14, 55:20,<br>64:17, 66:3,<br>80:2, 81:1,<br>81:8, 81:10,<br>81:17<br>**third**<br>8:18, 9:7,<br>9:18, 51:11,<br>62:18<br>**thought**<br>21:3, 21:4,<br>80:4, 83:5, 83:6<br>**thoughts**<br>54:1<br>**three**<br>83:4, 83:6<br>**through**<br>5:2, 6:11, 8:1,<br>16:7, 17:18,<br>30:10, 32:7,<br>34:10, 37:18,<br>39:7, 39:19,<br>62:4, 70:21,<br>73:11, 76:9<br>**throughout**<br>49:17, 66:11<br>**thunderstorm**<br>39:18<br>**thursday**<br>1:18 | **time**<br>9:9, 10:13,<br>10:16, 11:9,<br>11:17, 11:21,<br>11:22, 13:1,<br>15:20, 37:15,<br>38:11, 41:8,<br>49:13, 51:1,<br>55:19, 65:1,<br>74:3, 75:3,<br>78:15, 84:15<br>**times**<br>6:6, 66:12<br>**title**<br>12:15<br>**today**<br>15:12<br>**together**<br>17:14<br>**topic**<br>64:17, 67:7<br>**tornados**<br>49:17<br>**touched**<br>81:17<br>**touching**<br>24:16<br>**tpa**<br>8:18<br>**track**<br>50:17<br>**tracking**<br>49:15<br>**traditionally**<br>53:7<br>**training**<br>62:11, 62:17<br>**transcript**<br>5:4, 85:2,<br>85:4, 85:6,<br>86:4, 86:8, 87:4<br>**travel**<br>56:6<br>**treasury**<br>37:19<br>**treatment**<br>51:8<br>**true**<br>40:7, 56:16, |

**T**

**take**
15:9, 57:8,
60:5, 79:15,
85:4
**taken**
6:3, 6:8, 64:6,
84:2, 87:3, 87:6
**talk**
15:12, 32:2,
35:4, 71:1
**talked**
25:20

56:19, 86:4,
87:4
**try**
52:6
**trying**
70:16
**turn**
21:4
**turned**
21:3
**turns**
82:1
**twenty-plus**
75:13
**two**
6:22, 25:17,
32:1, 46:20,
63:16, 72:16,
76:4, 76:14,
84:19
**type**
13:22, 15:4,
52:18, 57:1,
67:7
**types**
14:2, 14:17,
39:15, 65:1
**typewriting**
87:7
**typically**
14:8, 15:6,
16:4, 24:14,
25:3, 25:6,
26:9, 31:22,
40:4, 40:18,
41:1, 41:16,
53:6, 56:5,
56:7, 57:19,
61:7, 61:13,
61:17, 64:15,
64:19, 70:12,
70:14, 72:11,
73:1, 73:5,
76:8, 78:8,
78:13, 78:15,
79:6, 84:9,
84:10
**typing**
35:15

| U |
|---|

**uncommon**
59:2
**under**
13:20, 14:9,
14:12, 14:13,
14:18, 15:6,
18:13, 19:15,
19:19, 20:15,
20:17, 23:22,
25:7, 26:7,
26:20, 28:17,
34:17, 40:5,
46:8, 51:14,
52:9, 53:4,
68:7, 68:12,
69:7, 76:7,
77:12, 82:4,
82:8, 87:7
**underside**
21:12
**understand**
16:9, 22:13,
32:10, 38:8,
40:12, 46:7,
59:20, 59:21,
64:20, 71:10,
76:7
**understanding**
5:21, 17:22,
18:2, 18:17,
19:19, 22:16,
28:4, 28:8,
29:14, 32:13,
37:3, 39:8,
40:4, 43:1,
47:10, 68:20,
69:13, 69:18,
83:5
**underwriter**
41:2, 41:15,
41:19, 42:9,
42:16, 43:6,
43:17, 44:1,
73:2
**underwriters**
42:20, 43:1,

43:2
**underwriting**
38:17, 44:4
**unfamiliar**
70:5
**unglued**
33:9
**united**
1:1
**universally**
40:8
**university**
7:19
**unless**
20:14, 20:16,
20:22
**until**
83:9
**unusual**
67:16
**upload**
85:3
**use**
23:3, 36:9,
50:7, 50:9,
51:13, 71:2,
81:3
**uses**
31:18
**using**
54:19
**usually**
39:6, 77:2

| V |
|---|

**vacation**
11:1, 74:2
**vague**
42:21, 59:18
**valves**
33:9
**vapor**
18:3, 18:7,
18:10, 18:18,
19:20, 19:21,
21:9, 21:16,
21:22, 23:11
**varies**
53:13

**variety**
63:22, 64:5
**vary**
53:14
**venture**
1:4, 5:13
**vericlaim**
54:20, 55:10,
55:13, 55:17,
55:20
**version**
17:9
**versus**
15:9, 24:14,
24:17, 25:9,
81:21, 84:18
**vice**
9:1, 11:4,
11:7, 12:9,
12:12, 12:13,
12:15
**view**
22:8, 22:11,
24:11, 40:14
**viewpoint**
14:15
**virginia**
3:8
**virtually**
1:17, 63:7
**virtue**
19:14
**visited**
54:17

| W |
|---|

**waiving**
85:7
**walls**
33:10
**want**
32:2, 32:3,
42:3, 73:15,
85:1
**wanted**
10:20, 52:1,
80:10
**wanting**
38:20

**wants**
43:7
**water**
21:10, 24:2,
24:11, 24:14,
24:15, 24:20,
24:21, 25:2,
25:4, 25:6,
25:7, 25:8,
25:9, 25:10,
25:15, 26:1,
26:4, 26:7,
27:10, 27:22,
28:4, 28:5,
28:11, 28:17,
32:17, 32:21,
32:22, 33:2,
33:8, 33:10,
33:11, 34:15,
39:22, 46:22,
80:14, 80:16,
80:18, 81:2,
81:7, 81:9,
81:13, 81:17,
81:18, 82:4,
82:7, 82:10,
82:13, 82:17,
84:18
**water's**
81:20
**way**
42:18, 49:14,
50:21, 51:15,
58:19, 65:19,
71:11, 81:11
**ways**
76:4
**we'll**
56:7, 77:22,
78:20
**we're**
15:12, 17:10,
28:20, 42:3,
45:14, 66:21,
71:15, 71:16,
72:11, 72:12
**weather**
39:11, 39:16,

39:17, 40:15,
49:3, 49:6, 49:8
**webber**
7:18
**website**
48:15, 48:20
**went**
9:18, 34:10,
44:13, 44:14,
56:1, 66:13,
72:22, 77:12,
78:6, 83:16
**westchester**
1:9, 8:11,
13:6, 13:8,
17:2, 55:14,
71:14, 73:18
**wet**
22:5, 22:9,
22:12, 67:22,
68:9, 82:7
**wetted**
82:3
**whatever**
45:15, 50:3
**whereof**
87:12
**whereupon**
5:5
**wherever**
76:18
**whether**
17:3, 23:22,
29:21, 43:6,
52:17, 53:3,
81:19, 83:1,
83:12
**whole**
17:19
**whomever**
60:20
**wish**
65:20
**withheld**
59:7
**within**
6:9, 71:21,
75:1

**without**
7:1, 77:3
**witness**
5:7, 45:13,
45:17, 85:14,
87:12
**wollan**
3:15
**wood**
21:11
**word**
30:5, 36:5,
36:10, 36:16,
36:22, 37:1,
60:16, 71:2
**wording**
20:12
**words**
26:14, 26:19,
36:3
**work**
6:13, 43:2,
44:7, 45:19,
49:21, 50:1,
50:6, 56:7,
57:11, 75:6
**work-related**
65:3
**worked**
8:4, 8:10,
8:17, 8:19, 9:7,
10:1, 52:16,
74:21
**working**
56:4, 62:5,
63:1, 67:4, 75:5
**works**
44:2, 45:3
**wouldn't**
19:3, 41:22,
42:1, 42:4,
43:22, 49:22,
53:18, 54:2
**written**
39:6, 43:21,
71:6, 71:12,
71:19
**wrong**
44:19

| Y |
|---|

**yeah**
8:3, 9:14,
9:15, 13:18,
25:20, 35:16,
36:4, 44:18,
44:21, 46:1,
46:12, 50:21,
55:11, 56:19,
60:8, 66:15,
66:18, 72:1,
74:11
**year**
10:2, 12:7,
63:17
**years**
70:3, 74:22,
75:13
**york**
3:16, 3:18

| $ |
|---|

**$100,000**
67:20, 68:18

| 0 |
|---|

**02946**
1:9
**03**
85:19
**04**
1:19

| 1 |
|---|

**10**
1:19
**10004**
3:18
**100120131**
19:6
**101**
3:7
**101016**
26:13
**10621**
3:6
**1099**
74:13, 74:16

Transcript of Richard Ketaily
Conducted on May 27, 2021

112

**12**
8:13, 9:17,
29:1, 85:19
**120**
15:7
**14**
82:11
**15**
6:7
**16**
4:14, 78:1,
79:2, 80:1
**17**
19:7, 30:10
**18**
78:22
**19**
1:9
**1990**
7:19
**1992**
8:4
**1:-cv--apm**
1:9

---
**2**
---

**2000**
8:4, 8:7, 10:4
**2004**
8:7, 8:10
**2006**
8:10, 8:13
**2011**
8:13, 9:17
**2012**
8:16, 9:15,
9:19
**2013**
8:16, 8:17,
8:19, 9:6
**2015**
8:16, 8:19,
8:21, 9:7, 9:19,
9:21, 12:8,
12:18
**2016**
75:8
**2019**
4:14, 4:15,

78:1, 78:21,
78:22, 79:2
**2020**
12:9, 12:15,
44:12
**2021**
1:18, 87:14
**2023**
87:15
**212**
3:19
**22030**
3:8
**26**
27:6
**27**
1:18

---
**3**
---

**30**
70:3
**3534**
1:4
**376399**
1:20
**39**
55:8

---
**4**
---

**41**
29:1
**42**
26:13, 27:6,
55:8
**44**
3:17
**4552**
3:19

---
**5**
---

**50**
71:22, 72:8,
72:10, 72:13,
72:15
**591**
3:9

---
**6**
---

**60**
6:9

**6666**
3:9

---
**7**
---

**703**
3:9
**7th**
78:21

---
**8**
---

**804**
3:19
**82**
4:5
**87**
1:21

---
**9**
---

**90**
15:6
**95**
56:21
**9th**
87:13