## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| **3534 EAST CAP VENTURE, LLC, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 19-cv-02946 (APM)** |
| ) | |
| **WESTCHESTER FIRE INSURANCE** ) | |
| **COMPANY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

---

## <u>MEMORANDUM OPINION</u>

### I.

This is an insurance coverage action.  On one side of the dispute are the insureds, Plaintiffs 3534 East Cap Venture, LLC ("East Cap"), a real estate developer, and McCullough Construction, LLC ("McCullough"), the construction company hired by East Cap.  The insurers are Defendants Westchester Fire Insurance Company and Endurance American Insurance Company.

In late January 2019, McCullough discovered significant amounts of condensation under the roof deck of the residential development project it was building, as well as water on the floor.  Further investigation led to the discovery of moisture and mold growth in the ceiling and walls, requiring McCullough to tear out insulation, drywall, and other materials to remediate the damage.  The remediation efforts cost nearly $1.5 million.  Plaintiffs turned to Defendants for coverage.  Defendants refused to insure the loss.

The parties agree on the chain of events that led to the damage.  An architect failed to include a vapor barrier in the project design.  The absence of that barrier allowed condensation to form due to a combination of humidity-increasing conditions inside the building and a change in

temperature outside the building.  As the condensation accumulated, it seeped into and soaked the drywall, insulation, and other building materials.  *See* Pls.' Opp'n to Defs.' Mot. for Summ. J & Cross Mot. for Summ. J., ECF No. 39 [hereinafter Pls.' Cross Mot.], Pls.' Mem. in Supp. of Pls.' Cross Mot., ECF No. 39-1 [hereinafter Pls.' Mem.], at 21 ("There is no factual dispute that the damage to the property was caused by water condensing on the interior side of the roof system because [the] building was initially built without a vapor barrier.").

The parties dispute whether there is coverage for the costs of the remediation.  The relevant policies cover a loss that is caused by "water damage."  Plaintiffs assert that, because the building materials were drenched with water, there is coverage.  Defendants, on the other hand, say there is no coverage because policy exclusions apply.  Specifically, the policies do not insure a loss caused by "dampness of atmosphere" and "changes in temperature," which Plaintiffs say are the conditions that led to the soaking of the building materials.

After Defendants denied coverage, Plaintiffs filed suit, asserting a single claim for breach of contract.  Am. Compl., ECF No. 19, at 9–10.  Both parties have moved for summary judgment.  Defs.' Mot. for Summ. J., ECF No. 38 [hereinafter Defs.' Mot.]; Pls.' Cross Mot.  For the reasons that follow, Defendants' motion is granted and Plaintiffs' motion is denied.

## II.

The relevant agreements are two identical Builder's Risk insurance policies issued separately by Defendants.  Pls.' Cross Mot., Pls.' Resp. to Defs.' Statement of Material Facts & Pls.' Additional Allegations of Undisputed Material Facts, ECF No. 39-2, ¶¶ 2–3; Defs.' Mot., Ex. 1, ECF No. 38-3 [hereinafter Policies].  The terms at issue are seemingly straightforward.  The policies provide coverage for loss "caused by or resulting from WATER DAMAGE," with a

$50,000 deductible.  Policies at 13.[1]  The policies define "WATER DAMAGE" to mean "[a]ll water damage, except LOSS caused by or resulting from the peril of FLOOD."  *Id.* at 38.  There is no dispute that the damage to the building materials constitutes a "LOSS."

The policies also set forth a host of exclusions.  *See id.* at 23–25.  As relevant here, the policies provide:

> **This Policy does not insure LOSS caused by any of the following, unless direct physical LOSS by an insured peril ensues and then this Policy insures only such ensuing direct physical LOSS:**
>
> . . .
>
> 3.  Dryness or dampness of atmosphere.
>
> 4.  Extremes or changes in temperature.

*Id.* at 25.

### III.

Under District of Columbia law, when insurance policies "are clear and unambiguous, they will be enforced by the courts as written, so long as they do not violate a statute or public policy." *Smalls v. State Farm. Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C. 1996) (internal quotation marks omitted).  "Where insurance contract language is not ambiguous, summary judgment is appropriate because a written contract duly signed and executed speaks for itself." *Travelers Indem. Co. of Ill. v. United Food & Com. Workers Int'l Union*, 770 A.2d 978, 985 (D.C. 2001) (cleaned up). "Whether an insurance contract is ambiguous is a question of law." *Id.* at 986 (citing *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C. 1990)).

Insurers have a duty to state in plain language, understandable to the "man in the street," any exclusions or limitations in the policy that would exclude a loss from coverage. *Holt v. George*

---

[1] The court uses ECF pagination for all Exhibits.

*Washington Life Ins. Co.*, 123 A.2d 619, 621 (D.C. 1956) (internal quotation marks omitted). "Failing such unambiguous language, doubt should be resolved in favor of the insured." *Id.* at 622 (internal quotation marks omitted). Thus, "[w]here an insurer attempts to avoid liability under an insurance policy on the ground that the loss for which recovery is sought is covered by some exclusionary clause, the burden is on the insurer to prove the facts which bring the case within the specified exception." *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 969 (D.C. 1999).

These principles do not mean that a court should strain to identify ambiguity in the agreement. "The canon of construction known as *contra proferentum* [sic]—that ambiguities in an insurance contract should be construed against the insurer who drafted the contract . . . is traditionally used only in cases of doubt where other factors are not decisive.'" *U.S. ex rel. Dep't of Lab. v. Ins. Co. of N. Am.*, 131 F.3d 1037, 1043 n.11 (D.C. Cir. 1997) (cleaned up) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 206 cmt. a (Am. L. Inst. 1979)). Thus, when insurance contracts are "clear and unambiguous, they will be enforced by the courts as written, so long as they do not violate a statute or public policy." *Smalls*, 678 A.2d at 35 (internal quotation marks omitted).

## IV.

The parties' coverage dispute condenses to two points. First, Defendants argue the undisputed facts establish that the combination of increased moisture within the building and a drop in outside temperature, in the absence of a protective vapor barrier, caused condensation to form under the roof and soak the building structure. Defs.' Mot., Defs.' Mem. in Supp. of Defs.' Mot., ECF No. 38-1 [hereinafter Defs.' Mem.], at 5–7. On these facts, Defendants say, the policy exclusions for "dampness of atmosphere" and "changes in temperature" apply. *See id.* at 6 (citing *Aetna Cas. & Sur. Co. v. Yates*, 344 F.2d 939, 940–41 (5th Cir. 1965) (using a "dampness of

atmosphere" exclusion to bar coverage for rot damage caused by indoor condensation)); *id.* at 10–12 (citing *Blaine Constr. Corp. v. Ins. Co. of N. Am.*, 171 F.3d 343, 354–56 (6th Cir. 1999) (Boggs, J., dissenting) (reasoning that the term "dampness of atmosphere" likely includes "indoor humidity" and is not ambiguous)). On the other hand, Plaintiffs urge the court to follow the Sixth Circuit's decision in *Blaine Construction*, which involved the same exclusionary language at issue here. Pls.' Mem. at 13–14. The majority in *Blaine Construction*, over a vigorous dissent, held that it was a reasonable reading of the terms "[d]ampness or dryness of atmosphere; extremes or changes in temperature" to refer "to weather conditions, and not as a reference to artificially enhanced humidity inside a building." 171 F.3d at 351 (alteration in original). And, because that construction was a reasonable one, the court found the "dampness of atmosphere" exclusion to be ambiguous, entitling the insured to coverage. *See id.* at 354.

The parties' second argument distills a bit more simply. Plaintiffs argue that even if the exemptions apply, the policies' "ensuing loss exception" restores coverage. Pls.' Mem. at 35; Policies at 25. That exception provides that an excluded loss will not be covered "unless direct physical LOSS by an insured peril ensues and then this Policy insures only such ensuing direct physical LOSS." Policies at 25. Plaintiffs posit that even if the original cause of the damage was an otherwise excluded cause, an "insured peril" ensued (water damage), thereby making theirs a covered loss. Pls.' Mem. at 37–40. Defendants respond that the ensuing loss exception does not apply because it is "generally accepted that an ensuing loss exception applies only to distinct, separable losses and does not provide coverage for the normal and necessary results of the excluded conduct." Defs.' Mem. at 8. In this case, they contend, "the ensuing loss exception does not provide coverage . . . because the so-called water damage is the direct result of excluded causes of loss—dampness of atmosphere and changes in temperature." *Id.* at 9.

The court agrees with Defendants on both issues: (1) the "dampness of atmosphere" exclusion is not ambiguous and thus excludes Plaintiffs' loss, and (2) the ensuing loss exception does not restore coverage.

## A.

The parties agree that the facts of *Blaine Construction* are nearly identical to those of this case. *See* Defs.' Mem. at 10–12; Pls.' Mem. at 12–15. The court therefore discusses *Blaine Construction* in detail.

The plaintiff in *Blaine Construction*, a construction contractor, "sought to hold the insurance company liable for the cost of replacing ceiling insulation ruined by water that had condensed within the insulation cavity after a subcontractor failed to install a vapor barrier properly." 171 F.3d at 345. Because of an improper vapor barrier installation, "[m]oisture could . . . migrate above the vapor barrier, and any condensation would be trapped in the cavities between the purlins." *Id.* at 346. The result was that "copious amounts of water had been trapped in the ceiling cavities across the entire structure." *Id.* Remediation required "remov[al] and replace[ment] [of] all of the water-soaked insulation." *Id.* at 347. The insurer denied coverage. The policy in question provided that "[t]his policy does not insure loss or damage caused directly or indirectly by any Peril excluded." *Id.* at 346. Among the excluded perils were "[d]ampness or dryness of atmosphere; extremes or changes in temperature." *Id.* The insurer relied on these exclusions to deny coverage. *Id.* at 345. Applying Tennessee law, a split panel found in favor of the insured.

The majority's reasoning rested on its understanding of the term "atmosphere" in the "dampness of atmosphere" exclusion. The majority recognized that "although the word 'atmosphere' often refers to the external atmosphere surrounding the earth, the term is also used,

not infrequently, to include the air inside a building or other confined space." *Id.* at 351.  Yet, the majority held, the term "atmosphere" as used in the policy was ambiguous.  "If [the insurer] had wanted to exclude dampness or dryness generally, the layman might think, there would have been no need to use the word 'atmosphere' at all.  The insurance company could simply have described the excluded peril as 'dampness or dryness.'" *Id.*  The majority continued, "[b]y adding a word that would not have been necessary if the company had not intended to refer to the 'atmosphere' in the most commonly used sense, and by speaking in the next breath of 'extremes or changes in temperature,' [the insurer] ran the risk, it seems to us, of being taken to mean that it was simply talking about weather conditions." *Id.*  Ultimately, calling the case a "close one," the majority said, "[w]e cannot say that [the insured's reading] is unreasonable . . . and because 'the insurer must establish that the exclusion applies in the particular case and that it is subject to no other reasonable interpretation,'" the court found the insured entitled to coverage.  *Id.* at 354 (internal quotation marks omitted).

In dissent, Judge Boggs declared, "I do not believe that the policy is ambiguous." *Id.* (Boggs, J., dissenting).  "A policy is ambiguous only when it supports more than one reasonable interpretation, and I do not believe that [the insured's] interpretation is reasonable." *Id.* (internal citation omitted).  Judge Boggs believed that, for the insured to prevail, it had to "do more than show us that 'dampness of atmosphere' *can* mean outdoor humidity.  It must show us that 'dampness of atmosphere' *cannot* mean indoor humidity." *Id.* at 355.  Looking to dictionary definitions and case law, Judge Boggs reasoned that "it is unreasonable to define 'dampness of atmosphere' in a way that excludes," as a definition of "atmosphere," "[t]he air in any particular place." *Id.* at 356, 358 (citing 1 OXFORD ENGLISH DICTIONARY 750 (2d ed. 1989)).  Indeed, in his view, "indoor humidity" is the "most common" meaning of "dampness of atmosphere." *Id.* at 356.

The court agrees with Judge Boggs that the term "dampness of atmosphere" is not ambiguous and plainly contemplates the increase in indoor humidity that led to the loss in this case. Under District of Columbia law, the "otherwise clear language in an insurance agreement is not to be deemed ambiguous 'merely because the parties do not agree' on its meaning." *Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001) (quoting *Byrd v. Allstate Ins. Co.*, 622 A.2d 691, 694 (D.C. 1993)). "Policy language is not genuinely ambiguous unless 'it is susceptible of more than one *reasonable* interpretation.'" *Id.* at 1127–28 (quoting *Am. Bldg. Maint. Co. v. L'Enfant Plaza Props., Inc.*, 655 A.2d 858, 861 (D.C. 1995)). In these policies, "dampness of atmosphere" is not ambiguous because there is no reasonable interpretation of the exclusion that would not reach increased indoor humidity. Put differently, for Plaintiffs to prevail, one *reasonable* construction of "dampness of atmosphere" would have to be that "atmosphere" *only* means outdoor weather conditions. Only then could "dampness of atmosphere" be ambiguous. But such a reading is contrary to the commonsense meaning of "atmosphere." Even the majority in *Blaine Construction* acknowledged that the term "is also used, *not infrequently*, to include the air inside a building or other confined space." 171 F.3d at 351 (emphasis added). Adopting Plaintiffs' preferred meaning would require the court to "indulge in [a] forced construction[] to create an obligation against the insurer," which it cannot do. *Cameron*, 733 A.2d at 968 (internal quotation marks omitted).

Plaintiffs advance a second argument to suggest ambiguity, but the court rejects it, too. Plaintiffs contend that the group of four exclusions that include "dampness of atmosphere" and "extremes or changes in temperature," when read in context, "suggest . . . a loss proximately caused by deterioration of property." Pls.' Mem. at 26. Citing the doctrine of *noscitur a sociis*— that is, the interpretative principle that words are known by the company they keep, *see Yates v.*

*United States*, 574 U.S. 528, 543 (2015)—Plaintiffs argue "dampness of atmosphere, extremes or changes in temperature, normal settling, shrinking[,] cracking, expansion or contraction, and corrosion, decay[,] deterioration, etc., are all means by which property degrades or destroys itself over time." Pls.' Mem. at 27. The loss that occurred here was caused by a short-term accumulation of moisture and therefore is different than the excluded losses. So, Plaintiffs contend, the exclusion does not apply.

But this too is a strained reading of the policies. Nothing within the exclusion section in question limits losses to those that occur "over time." In fact, the exclusions for "dryness or dampness of atmosphere" and "extremes or changes in temperature" by their very nature suggest the opposite, as those events are typically associated with short-term changes in conditions. *Noscitur a sociis* "is not a guideline to be followed if the language of the policy exclusion manifests a clear contrary intent. That is the case here." *Chase*, 780 A.2d at 1129 (rejecting similar attempt to create ambiguity in a policy based on the related *ejusdem generis* principle of interpretation).

Finally, Plaintiffs contend that because the policies do not explicitly exclude loss caused by "condensation," the court should not read the policies to exclude such a loss. To support their position, Plaintiffs point to other insurance policies that do expressly exclude loss caused by condensation. Pls.' Mem. at 33–34; Pls.' Mem., Ex. 9, ECF No. 39-12, at 4 (policy containing exclusion for "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more"). Plaintiffs assert that "if the insurers wanted to exclude all condensation losses, then it goes to reason that the word 'condensation' should have been mentioned in the policy, but it was not." Pls.' Mem. at 34.

Plaintiffs, however, cite no case for the proposition that the court can look to the language of *other* insurance policies to override the unambiguous meaning of the policies that govern here. *Cf. Dist.-Realty Title Ins. Corp. v. Ensmann*, 767 F.2d 1018, 1022 (D.C. Cir. 1985) ("[T]he parol evidence rule bars the introduction of extrinsic evidence to vary the terms of an unambiguous contract."). And as Defendants point out, the express condensation exclusion that Plaintiffs say is "industry standard," Pls.' Mem. at 35, comes from a standard commercial policy, not a builder's risk policy of the kind at issue here. Defs.' Mem. of Law in Further Supp. of Defs.' Mot. and in Opp'n to Pls.' Cross Mot., ECF No. 41, at 8 n.1. That a *different* type of policy contains a *different* exclusion cannot alter the governing policies' plain meaning or create ambiguity where there is none.

Accordingly, the court concludes that Plaintiffs' loss is not covered because it was caused by the excluded perils of "dampness of atmosphere" and "changes in temperature."

## B.

The court turns now to Plaintiffs' alternative contention that the "ensuing loss" clause revives coverage. Recall, the policies state that "[t]his Policy does not insure LOSS caused by any of the following, unless direct physical LOSS by an insured peril ensues and then this Policy insures only such ensuing direct physical LOSS." Policies at 25. According to Plaintiffs, because "water damage is a covered peril under the policy," the ensuing loss clause restores coverage even if the exclusions apply. Pls.' Mem. at 37–38.

The parties put forward competing views on how to interpret the ensuing loss clause. According to Defendants, "it is generally accepted that an ensuing loss exception applies only to distinct, separable losses and does not provide coverage for the normal and necessary results of the excluded conduct." Defs.' Mem. at 8 (citing cases). Here, they contend, "the ensuing loss

exception does not provide coverage . . . because the so-called water damage is the direct result of excluded causes of loss—dampness of atmosphere and changes in temperature." *Id.* at 9.

For their part, Plaintiffs encourage the court to look to Maryland law, because District of Columbia law has not interpreted ensuing loss clauses. Pls.' Mem. at 37–40. According to Plaintiffs, Maryland law does not subscribe to the view that an ensuing loss clause covers only "distinct, separable losses," but reads the clause more expansively to extend "coverage to a covered event traceable to an excluded peril." *Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, No. ELH-18-3918, 2020 WL 1063060, at *13 (D. Md. Mar. 5, 2020) (rejecting reading a "separate and independent" limitation into an ensuing loss clause, under Maryland law, as contrary to "customary, ordinary, and accepted meaning" (internal quotation marks omitted)); Pls.' Mem. at 37. Plaintiffs thus argue that, because water damage is a covered peril that ensued from the excluded conditions, the ensuing loss clause restores coverage. Pls.' Mem. at 40.

But even granting Plaintiffs' broader construction of the ensuing loss clause, the clause does not apply in this case. Under Maryland law, if the original, excluded peril is "inextricably intertwined" with the ensuing, covered peril, the ensuing loss exception is not applicable. *See Bethany Boardwalk*, 2020 WL 1063060, at *15. Critically, damages and peril must not be "conflate[d]" in an attempt to shoehorn in coverage for losses caused by peril that is explicitly not covered under an insurance policy. *See, e.g.*, *Jowite Ltd. P'ship v. Fed. Ins. Co.*, No. DLB-18-2413, 2020 WL 4748544, at *8 (D. Md. Aug. 17, 2020), *aff'd*, No. 20-1937, 2021 WL 5122173 (4th Cir. Nov. 4, 2021) (finding no coverage for loss where the plaintiff "conflate[d] damages and peril, suggesting they are one and the same"). To hold otherwise "would transform the ensuing loss clause into a 'grant back' provision and eviscerate the [exclusion]." *Bethany Boardwalk*, 2020 WL 1063060 at *16.

In this case, the excluded causes—"dampness of atmosphere" and "changes in temperature"—are "inextricably intertwined" with the ensuing peril of water damage. Indeed, the excluded causes of loss and the allegedly covered peril are more than inextricably intertwined— they are "one and the same," for the reasons already articulated in Section IV A above. *See, e.g.*, *Jowite*, 2020 WL 4748544, at *8. The increase in humidity and change in temperature led directly to "the formation of liquid water in the insulation cavity," "which saturated the insulation and wetted the building materials." Pls.' Mem. at 17, 37–38. Because the original, excluded peril and the ensuing, covered peril are at least inextricably intertwined, the ensuing loss clause does not revive coverage for Plaintiffs.

## C.

In their moving papers, Plaintiffs alluded to a different argument for coverage that they later developed more fully in their reply brief. In their opening brief, Plaintiffs asserted in a single sentence the theory that the architect's failure to include a vapor barrier in the design caused the loss and was a covered peril giving rise to coverage: "[W]hen that alleged defective design or faulty workmanship resulted in water damage, the ensuing loss, coverage is provided under the policy." Pls.' Mem. at 18. In their reply, Plaintiffs expressly advanced this theory of coverage. They wrote, "[b]ecause the proximate cause of the loss, the 'failure to install a vapor barrier' was itself not excluded, all the resulting damages are covered irrespective of whether dampness of atmosphere or changes of temperature contributed to the loss." *See* Pls.' Reply in Supp. of Pls.' Cross Mot., ECF No. 43, at 3; *see also id.* at 7 ("The water damage was caused by defective workmanship. Both water damage and defective workmanship are covered causes of loss."). Because Plaintiffs largely raised this argument for the first time in their reply brief, the court asked Defendants to file a sur-reply to address the issue. Order, ECF No. 45. They did so. Surreply in

12

Supp. of Defs.' Mot. and in Opp'n to Pls.' Cross Mot., ECF No. 46.  Because the faulty-design argument is now fully briefed, the court exercises its discretion to consider it.  *See Lu v. Lezell*, 45 F. Supp. 3d 86, 91 (D.D.C. 2014) ("If the movant raises arguments for the first time in his reply to the non-movant's opposition, the Court may either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply.").

Plaintiffs' new argument rests on a misreading of the policies.  The policies do not cover any loss that follows from a design defect.  To the contrary, the policies contain an exclusion titled, "Cost of Making Good."  Policies at 25.  That provision excludes "costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the LOSS," including "[f]ault, defect, error, deficiency or omission in design, plans, [and] specifications."  *Id.*  The exclusion contains its own ensuing loss clause: "However, if direct physical LOSS by an insured peril ensues, then this Policy will provide cover for such ensuing LOSS only."  *Id.*  Taken together, these provisions mean that the policies do not provide coverage for the costs to remedy a design defect, but they do cover any resulting loss from a covered peril. Thus, the "cost of making good" exclusion simply requires the court to answer the original question: Was the loss here caused by an "insured peril"?  It was not.  The loss was caused by expressly excluded perils—"dampness of atmosphere" and "changes in temperature."  So, because no ensuing covered loss followed from the design error of not including a vapor barrier, Defendants properly denied Plaintiffs coverage.

## V.

Defendants also move for summary judgment to the extent Plaintiffs advance a claim of bad faith.  Defs.' Mem. at 12.  Plaintiffs admit they have not raised such a claim but instead contend

that the insurers violated the implied covenant of good faith and fair dealing, which entitles them to attorney's fees under District of Columbia law. Pls.' Mem. at 40–41. But because Defendants did not erroneously deny coverage, Plaintiffs' claim for attorney's fees falls away.

## VI.

For the foregoing reasons, the court grants Defendants' Motion for Summary Judgment, ECF No. 38, and denies Plaintiffs' Cross Motion for Summary Judgment, ECF No. 40. A final, appealable order accompanies this Memorandum Opinion.

Dated:  September 29, 2022

Amit P. Mehta
United States District Judge